# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PARIJAAT DIXIT, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>SMART DIGITAL GROUP LIMITED, YUNTING CHEN, QIONGSHAN HUANG, SAM WAI HONG, ENROME LLP, US TIGER SECURITIES, INC., and JOHN DOES 1-100,<br><br>                  Defendants. | Case No: 1:26-cv-00296<br><br>**<u>CLASS ACTION</u>**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

<u>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

Plaintiff Parijaat Dixit ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Smart Digital Group Limited ("SDM" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by SDM; and (c) review of other publicly available information concerning SDM and similar entities.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired SDM securities between May 5, 2025, and September 26, 2025, at 9:34 AM EST, inclusive (the "Class Period"). Plaintiff pursues claims against SDM, Yunting Chen, Qionshan Huang, Sam Wait Hong, Enrome LLP, and US Tiger Securities, Inc., as well as unidentified John Does 1-100, (the "Defendants"), under the Securities Exchange Act of 1934.

2.    The Company conducts its purported business operations in Singapore, Macau, and Mainland China, through three operating entities: SMART DIGITAL META PTE. LTD., AOSI PRODUCTION CO., LTD., and Xiamen Liubenmu Culture Media Co., Ltd. The operating entities purportedly provide a broad range of services including: (1) event planning and execution services, which consist of drafting event planning proposals, customizing event marketing strategies, engaging event sponsors and other related services; (2) internet media services, which include developing marketing strategies, designing marketing content, distributing such marketing content on select internet platforms and other related services; (3) software customization and marketing services which enable customers to formulate and implement marketing activities through

proprietary software; and (4) business planning and consulting services, which include business development planning, business data analysis, and other related services.

3.      The Company is a holding company incorporated in the Cayman Islands. During the Class Period, SDM's principal executive offices are located at 150 Beach Road, #2805/06 Gateway, West Singapore 189720. As of January 12, 2026, the Company consolidated its administrative and management functions with new executive offices at No. 2615, Xingsheng 1st Road, Hengqin New District, Zhuhai City, Guangdong Province, China. The Company completed its initial public offering on May 5, 2025, selling 1.5M ordinary shares at offering price of $4.00 per share, raising $6M in gross proceeds.

4.      This case arises from the sudden collapse of SDM's stock price on September 26, 2025, and the still-pending halt of trading in the Company's securities due to a fraudulent market manipulation scheme that caused the Company's stock price to trade as high $29.40 per share intraday on July 28, 2025, despite no fundamental news to justify such a spike in the Company's stock price. Investigation and public reports have revealed that SDM was a vehicle utilized in a market manipulation and "pump-and-dump" promotional scheme. Impersonators acting as financial advisors touted SDM in online forums, chat groups, and social media posts with baseless claims to create a buying frenzy amongst retail investors.

5.      On September 26, 2025, the Company's stock price collapsed 86.4% to close at $1.85 per share following an intraday halt by the NASDAQ Stock Market (the "NASDAQ") for volatility just minutes after the market opened. Before the next trading day began, the SEC suspended trading in SDM securities from September 29, 2025, through October, 10, 2025, due to "potential manipulation" in the Company's securities "effectuated through recommendations made to investors by unknown persons via social media to purchase the securities of SDM, which

appear to be designed to artificially inflate the price and volume of the securities of SDM." The SEC cautioned "broker-dealers, shareholders and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company." With the SEC suspension scheduled to expire, on October 11, 2025, NASDAQ suspended trading in SDM securities pending a request for additional information. At the time of this filing, trading in SDM securities remains suspended with no end in sight.

6.      Throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and the true nature of the trading activity in the securities. Specifically, Defendants failed to disclose to investors that: (1) SDM was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) insiders and/or affiliates used and/or intended to use offshore or nominee accounts to facilitate the coordinated dumping of shares during a price inflation campaign; (3) SDM's public statements and risk disclosures omitted any mention of realized risk of fraudulent trading or market manipulation used to drive the Company's stock price; (4) as a result, SDM securities were at unique risk of a sustained suspension in trading by either or both of the SEC and NASDAQ; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

## II.    JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's agent for service of process and the Underwriter Defendant (defined below) are located in this Judicial District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and/or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

11.     Plaintiff Parijaat Dixit, as set forth in the accompanying certification, incorporated by reference herein, purchased SDM securities during the Class Period, and suffered substantial damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant SDM is a Cayman Islands incorporated holding company with principal executive offices in China. The Company's common stock traded on the NASDAQ under the symbol "SDM" during the Class Period and has been halted from trading since September 29, 2025.

13.     Defendant Yunting Chen ("Chen") is and was the Company's Chief Executive Officer at all relevant times.

14.    Defendant Qiongshan Huang ("Huang") was the Company's Chief Financial Officer at all relevant times. On October 20, 2025, Huang served his letter of resignation on the Company. Huang was replaced by Tan Kwang Leng.

15.    Defendant Sam Wai Hong ("Hong") was the Company's Chairman of the Board of Directors at all relevant times.

16.    Defendant Enrome LLP ("Enrome" or the "Auditor Defendant") has served as the Company's auditor since 2023.

17.    Defendant US Tiger Securities, Inc., ("Tiger Securities" or the "Underwriter Defendant") served as the Company's underwriter in connection with its May 5, 2025, IPO. Tiger Securities is headquartered within this District.

18.    Defendants John Does 1-100 are co-conspirators in the market manipulation scheme, whose true identities can only be ascertained following discovery, but include and are not limited to members of the so-called "Syndicate" as referred to in the SEC's court filings in *Peiyong v. U.S. Securities and Exchange Commission,* Case No. 1:25-mc-000350 (S.D.N.Y.) (ECF No. 7), as well as stock promoters using social media and messaging applications, and additional, unidentified underwriters involved in the stock manipulation scheme.

19.    Defendants Chen, Huang, and Hong (collectively, the Individual Defendants), because of their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to the market. The Individual Defendants were provided with copies of the Company's public filings, reports, and press releases alleged herein to be materially misleading prior to, or shortly after, their issuance and had the ability, opportunity, and obligation to prevent their issuance or promptly correct them. Because of their positions and access to material non-public information available to them, the

Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representation which was being made was then materially false and/or misleading. The Individual Defendants are liable for the false statement pleaded herein.

20.    The Auditor Defendant issued a clean audit opinion on the Company's financial statements incorporated into the Registration Statement issued in connection with the Company's May 5, 2025, IPO. Additionally, Defendant Enrome was SDM's auditor throughout and for years prior to the Class Period and had access to material non-public information. Because of its position, Enrome knew or should have known that the adverse facts alleged herein had not been disclosed to and were being concealed from the investing public and that the positive representations being made were materially false and/or misleading. Furthermore, due to its position, Defendant Enrome had the ability and opportunity to prevent issuance of fraudulent SEC filings or cause them to be corrected. Therefore, the Auditor Defendant is also liable for the materially false and misleading statements and omissions pleaded herein.

21.    The Underwriter Defendant was identified as the sole book-running manager on the IPO at numerous points throughout the Prospectus (defined below), the sole representative underwriter and signatory on the underwriting agreement between the Company and the underwriters (the "Underwriting Agreement") and agreed to conduct the IPO on a firm commitment basis. The Underwriter Defendant, based on its position, had the ability and opportunity to prevent the issuance of fraudulent SEC filings and/or cause them to be corrected. With this authority and by acting as sole book-runner and representative for the underwriters, Plaintiff and the Class could and did reasonably attribute the materially misleading false statements and omissions contained in the Registration Statement (defined below) to the Underwriter

Defendant and accordingly, the Underwriter Defendant is also liable for the false statements and omissions pleaded herein.

22.     The Underwriter Defendant has served as underwriter and/or sole book-runner in other recent IPOs of similar foreign, microcap companies that have experienced extreme price volatility resulting in significant investors losses including, but not limited to DarkIris Inc., ("DarkIris") and ChowChow Cloud International Holdings Limited, ("ChowChow"). On September 30, 2025, DarkIris was halted from trading by the NASDAQ and its stock declined from $10.43 per share at open down to $1.29 per share at closing on September 30, 2025. On December 9, 2025, ChowChow was halted from trading by the NASDAQ and saw its stock collapse from $11.77 per share at open down to a closing price of $1.83 per share.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Material Misstatements and Omissions Are Contained in SDM's Registration Statement and Prospectus

23.     The Class Period begins on May 5, 2025, when the Company filed its IPO Prospectus permitting SDM to issue 1,500,000 ordinary shares at an initial offering price of $4.00 per share for a total capital raise of $6M (the "Prospectus"). In the Prospectus dated May 1, 2025, which formed part of the registration statement filed in connection with the IPO (the "Registration Statement"), the Company described its business as well as financial results for its different services, as follows:

> Our Company is an exempted company incorporated in the Cayman Islands. Our Company has no material operations of its own and conducts its business operations through three operating entities: SMART DIGITAL META PTE. LTD., AOSI PRODUCTION CO., LTD., and Xiamen Liubenmu Culture Media Co., Ltd. The aforementioned operating entities conduct their business activities in Singapore, Macau, and Mainland China, respectively. The operating entities provide a broad range of services including: (1) event planning and execution services, which consist of drafting event planning proposals, customizing event marketing strategies,

engaging event sponsors and other related services; (2) internet media services, which include developing marketing strategies, designing marketing content, distributing such marketing content on select internet platforms and other related services; (3) software customization and marketing services, which enable customers to formulate and implement marketing activities through our AOSI PRODUCTION CO., LTD.'s proprietary software; and (4) business planning and consulting services, which include business development planning, business data analysis and other related services.

Our Company's revenue has demonstrated significant growth in the previous two fiscal years. In the fiscal years ended September 30, 2024 and 2023, our revenue was $21,519,072 and $9,702,145, respectively, representing a growth rate of approximately 121.8%. For the same fiscal years, event planning and execution services accounted for approximately 7.3% and 30.4% of our total revenue, respectively; internet media services accounted for approximately 88.2% and 21.5% of our total revenue, respectively; software customization and marketing services accounted for approximately 0% and 9.6% of our total revenue, respectively; and business planning and consulting services accounted for approximately 4.5% and 38.5% of our total revenue, respectively. For the same fiscal years, our net income was $1,696,654 and $1,993,262, respectively. We did not generate any revenue from software customization and marketing services in the fiscal year ended September 30, 2024 primarily because of the strategic shift in our business focus to internet media services.

24.    The Prospectus also contained financial results for fiscal 2023 and 2024, as well as the Report of Independent Registered Public Accounting Firm signed by Defendant Enrome regarding those financial results. Specifically, Defendant Enrome reported the following:

Opinion on the Financial Statements
We have audited the accompanying consolidated balance sheets of Smart Digital Group Limited and its subsidiaries (the "Company") as of September 30, 2024 and 2023, and the related consolidated statements of operations and comprehensive income, changes in shareholders' equity, and cash flows for each of the years ended September 30, 2024, and 2023 the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of September 30, 2024 and 2023 and the results of its operations and

its cash flows for each of the years ended September 30, 2024 and 2023, in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP").

<u>Basis for Opinion</u>
These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statement. We believe that our audits provide a reasonable basis for our opinion.

/s/ Enrome LLP

25.    The Prospectus also provided information regarding the Company's purported "Strengths[,]" which included the following:

***Ability to retain and attract customers***

9

We believe the operating entities' ability to retain the existing customers and attract new customers is one of the core strengths. For the fiscal years ended September 30, 2024 and 2023, the operating entities maintained stable relationships with substantially all of their significant customers. The operating entities have cultivated favorable relationships with internet platforms and other business partners by maintaining effective communications, engaging in repeated cooperation and undertaking public relations efforts. We believe such sustainable relationships enhance client retention, new business from word of mouth and corporate reputation.

### Ability to meet customer demands

The operating entities are dedicated to providing quality services to their customers. To satisfy customers' demands, the operating entities seek to maintain effective communications with the customers throughout the continuation of the projects. To address potential customer requirements and stay abreast of industry trends, the operating entities attend industry events, interact with industry experts, collect various sources of market intelligence, such as Internet advertising information, community forum postings and market tenders, and perform market analyses for their primary business locations. We believe the operating entities' ability to meet customer demands will improve customer experience and enhance customer loyalty.

### Visionary operating teams

The operating teams at the operating entities are composed of relatively young professionals. Such young professionals grew up in the information age and are well-acquainted with the rapid evolution of the internet. They demonstrate insights in digital marketing and various digital and technological innovations, which promotes the operating entities' ability to provide software customization and marketing services and other services in line with the technological and industry trends. Such young professionals also demonstrate understanding of the young generation's habits and preferences, which promotes the operating entities' ability to help customers plan events that appeal to the young target audience. We believe these endeavors will not only enhance the attractiveness and visibility of the operating entities' services but also lead to customer acquisition opportunities.

### Experienced management team

Our Company's management team has extensive industry experience. The management team has accumulated comprehensive knowledge and skills in logistics management, finance, business

10

development,    marketing    and    operation    planning.    See "*Management*."

26.    The Prospectus also addressed the Company's purported "Growth Strategies[,]"

stating as follows:

> In order to remain competitive in the marketplace, the operating entities are committed to staying informed about market demands, securing skilled human resources, and continuously seeking ways to enhance service efficiency. In the medium to long term, the operating entities have outlined several growth strategies. First, they plan to gradually shift the focus away from event planning and execution services and retain only certain categories of events for which they will continue to provide services, such as industry meetings and cultural performances. Second, they plan to strengthen the internet media services and business planning and consulting services, by improving the quality of services, leveraging digital and technological innovations, and optimizing their business processes. Third, they plan to create cross-selling opportunities and foster synergic growth in their services. Fourth, they may expand into new markets, including but not limited to Malaysia, because Malaysia is geographically close to our Singapore headquarters, demonstrates similarities in user habits and preferences to our existing markets, and remains an overlooked market where the full market potential has yet to be explored. As of the date of this prospectus, the operating entities have not made any plans to introduce new service types and have not entered into any agreements for the expansion into additional markets.

27.    The Prospectus also included vague, boilerplate disclosures regarding risk factors

that could hypothetically adversely affect the Company and its investors including the following:

> ***Certain recent initial public offerings of companies with public floats comparable to our anticipated public float have experienced extreme volatility that was seemingly unrelated to the underlying performance of the respective company. We may experience similar volatility, which may make it difficult for prospective investors to assess the value of our Ordinary Shares.***
>
> In addition to the risks addressed below in "— The market price of our Ordinary Shares may be volatile or may decline regardless of our operating performance, and you may not be able to resell your shares at or above the initial public offering price," our Ordinary Shares may be subject to extreme volatility that is seemingly

11

unrelated to the underlying performance of our business. Recently, companies with comparable public floats and initial public offering sizes have experienced instances of extreme stock price run-ups followed by rapid price declines, and such stock price volatility was seemingly unrelated to the respective company's underlying performance. Although the specific cause of such volatility is unclear, our anticipated public float may amplify the impact the actions taken by a few shareholders have on the price of our Ordinary Shares, which may cause our share price to deviate, potentially significantly, from a price that better reflects the underlying performance of our business. Should our Ordinary Shares experience run-ups and declines that are seemingly unrelated to our actual or expected operating performance and financial condition or prospects, prospective investors may have difficulty assessing the rapidly changing value of our Ordinary Shares. In addition, investors of our Ordinary Shares may experience losses, which may be material, if the price of our Ordinary Shares declines after this offering or if such investors purchase our Ordinary Shares prior to any price decline.

Holders of our Ordinary Shares may also not be able to readily liquidate their investment or may be forced to sell at depressed prices due to low volume trading. Broad market fluctuations and general economic and political conditions may also adversely affect the market price of our Ordinary Shares. As a result of this volatility, investors may experience losses on their investment in our Ordinary Shares. Furthermore, the potential extreme volatility may confuse the public investors of the value of our Ordinary Shares, distort the market perception of our share price and our Company's financial performance and public image and negatively affect the long-term liquidity of our Ordinary Shares, regardless of our actual or expected operating performance. If we encounter such volatility, including any rapid share price increases and declines seemingly unrelated to our actual or expected operating performance and financial condition or prospects, it will likely make it difficult and confusing for prospective investors to assess the rapidly changing value of our Ordinary Shares and understand the value thereof.

*            *            *            *            *

***The market price of our Ordinary Shares may be volatile or may decline regardless of our operating performance, and you may not be able to resell your shares at or above the initial public offering price.***

The initial public offering price for our Ordinary Shares may vary from the market price of our Ordinary Shares following our initial public offering. If you purchase our Ordinary Shares in our initial public offering, you may not be able to resell those shares at or above the initial public offering price. We cannot assure you that the initial public offering price of our Ordinary Shares, or the market price following our initial public offering, will equal or exceed prices in privately negotiated transactions of our Ordinary Shares that have occurred from time to time prior to the completion of our initial public offering. The market price of our Ordinary Shares may fluctuate significantly in response to numerous factors, many of which are beyond our control, including:

•    actual or anticipated fluctuations in our revenue and other operating results;

•    the financial projections we may provide to the public, any changes in these projections or our failure to meet these projections;

•    actions of securities analysts who initiate or maintain coverage of us, changes in financial estimates by any securities analysts who follow our Company, or our failure to meet these estimates or the expectations of investors;

•    announcements by us or our competitors of significant services or features, technical innovations, acquisitions, strategic partnerships, joint ventures, or capital commitments;

•    price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;

•    lawsuits threatened or filed against us; and

•    other events or factors, including those resulting from war or incidents of terrorism, or responses to these events.

In addition, the stock markets have experienced extreme price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many companies. Stock prices of many companies have fluctuated in a manner unrelated or disproportionate to the operating performance of those companies. In the past, stockholders have filed securities class action litigation following periods of market volatility. If we were to become involved in securities litigation, it could subject us to substantial costs, divert resources and the attention of management from our business, and adversely affect our business.

28.    Additionally, the Company issued boilerplate risk disclosures concerning its internal controls and the implementation thereof:

> ***Our inability to effectively manage our growth could have an adverse effect on our financial condition, results of operations, cash flows and prospects.***
>
> Our inability to manage our expansion effectively and execute our growth strategy in a timely manner, or within budget estimates, or our inability to meet the expectations of customers and other stakeholders, could have an adverse effect on our financial condition, results of operations, cash flows and prospects. Our future prospects will depend on our ability to grow our business and operations, which could be affected by many factors, including our ability to introduce new services and maintain the quality of the services, general political and economic conditions, government policies or strategies in respect of specific industries, prevailing interest rates, price of products we procure, energy supply and currency exchange rates.
>
> In order to manage our growth effectively, we must implement, upgrade and improve our operational systems, procedures and internal controls on a timely basis. If we fail to implement these systems, procedures and controls on a timely basis, or if there are weaknesses in our internal controls that would result in inconsistent internal standard operating procedures, we may not be able to meet our customers' needs, hire and retain new employees or operate our business effectively. Moreover, our ability to sustain our rate of growth depends significantly upon our ability to select and retain key managerial personnel, maintain effective risk management practices and train managerial personnel to address emerging challenges.
>
> We cannot assure you that our existing or future management, operational and financial systems, procedures and controls will be adequate to support future operations or establish or develop business relationships beneficial to future operations. Failure to manage growth effectively could have an adverse effect on our financial condition, results of operations, cash flows and prospects.
>
> \*            \*            \*            \*            \*
>
> ***If we fail to implement and maintain an effective system of internal controls, we may be unable to accurately or timely report***

14

*our results of operations or prevent fraud, and investor confidence and the market price of our Ordinary Shares may be materially and adversely affected.*

Prior to the completion of this offering, we have been a private company with limited accounting personnel. Furthermore, prior to the completion of this offering, our management has not performed an assessment of the effectiveness of our internal control over financial reporting, and our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting. Effective internal control over financial reporting is necessary for us to provide reliable financial reports and, together with adequate disclosure controls and procedures, is designed to prevent fraud.

Our failure to implement and maintain effective internal controls over financial reporting could result in errors in our financial statements that could result in a restatement of our financial statements, cause us to fail to meet our reporting obligations and cause investors to lose confidence in our reported financial information, which may result in volatility in and a decline in the market price of our Ordinary Shares.

Upon the completion of this offering, we will become a public company in the United States subject to the Sarbanes- Oxley Act of 2002. Section 404 of the Sarbanes-Oxley Act of 2002, or Section 404, will require that we include a report of management on our internal control over financial reporting in our annual report on Form 20-F. In addition, if we cease to be an "emerging growth company" as such term is defined in the JOBS Act, our independent registered public accounting firm must attest to and report on the effectiveness of our internal control over financial reporting on an annual basis. Our management may conclude that our internal control over financial reporting is not effective. Moreover, even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm, after conducting its own independent testing, may issue a report that is qualified if it is not satisfied with our internal controls or the level at which our controls are documented, designed, operated or reviewed, or if it interprets the relevant requirements differently from us. In addition, after we become a public company, our reporting obligations may place a burden on our management, operational and financial resources and systems for the foreseeable future. We may be unable to timely complete our evaluation testing and any required remediation.

15

During the course of documenting and testing our internal control procedures, in order to satisfy the requirements of Section 404, we may identify material weaknesses and deficiencies in our internal control over financial reporting. The PCAOB has defined a material weakness as "a deficiency, or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim statements will not be prevented or detected on a timely basis."

In addition, if we fail to maintain the adequacy of our internal control over financial reporting, as these standards are modified, supplemented or amended from time to time, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404. Generally speaking, if we fail to achieve and maintain an effective internal control environment, we could suffer material misstatements in our financial statements and fail to meet our reporting obligations, which would likely cause investors to lose confidence in our reported financial information. This could in turn limit our access to capital markets, harm our results of operations and lead to a decline in the trading price of our Ordinary Shares. Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud, misuse of corporate assets and legal actions under the United States securities laws and subject us to potential delisting from Nasdaq, to regulatory investigations and to civil or criminal sanctions.

29.     With respect to the reasons behind the Company's IPO, the Prospectus stated the following regarding its intentions post-IPO and how it would use the net proceeds:

The net proceeds from the sale of 1,500,000 Ordinary Shares in this offering will be approximately $3,845,362, after deducting the underwriting discounts, non-accountable expense allowance, and offering expenses payable by us, based on the initial public offering price of $4.00 per Ordinary Share, excluding the number of Ordinary Shares issuable upon the exercise of the over-allotment option granted to the underwriters.

We plan to use the net proceeds we receive from this offering for the following purposes:

•       approximately 45% for working capital and other general operations;

- approximately 28% for business expansion through acquisitions of appropriate media platforms, although as of the date of this prospectus, our Company has not identified, nor has our Company engaged in any material discussions regarding, any potential target;

- approximately 15% for brand promotion and marketing; and

- approximately 12% for software development.

The foregoing represents our current intentions based upon our present plans and business conditions to use and allocate the net proceeds of this offering. Our management, however, will have flexibility and discretion to apply the net proceeds of this offering. If an unforeseen event occurs or business conditions change, we may use the proceeds of this offering differently than as described in this prospectus. *See "Risk Factors — Risks Relating to This Offering and the Trading Market — Our management has broad discretion to determine how to use the funds raised in the offering and may use them in ways that may not enhance our results of operations or the price of our Ordinary Shares."*

To the extent that the net proceeds we receive from this offering are not immediately used for the above purposes, we intend to invest our net proceeds in short-term, interest-bearing bank deposits or debt instruments.

In using the proceeds of this offering, we are permitted under PRC laws and regulations to utilize the proceeds from this offering to fund our PRC subsidiaries by making loans or additional capital contributions, subject to applicable government registration and approval requirements. We cannot assure you that we will be able to obtain these government registrations or approvals on a timely basis, if at all. *See "Risk Factors — Risks Relating to Doing Business in the PRC."*

30.     The statements identified above in paragraphs 23 through 29 were and are false and misleading because the statements failed to disclose that: (1) SDM was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) insiders and/or affiliates used and/or intended to use offshore or nominee accounts to facilitate the coordinated dumping of shares during a price inflation campaign; (3) SDM's public statements and risk disclosures omitted any mention of

intention to use fraudulent trading or market manipulation used to drive the Company's stock price; (4) that, as a result, SDM securities were at unique risk of a sustained halt in trading by either of the SEC or NASDAQ; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

31.     Each of the Individual Defendants signed the Registration Statement. The Prospectus contains the signature of the Auditor Defendant with respect to its opinion and report on the Company's financial statements. The Prospectus identifies Tiger Securities as the "sole-book running manager" for the IPO and Tiger Securities was a party and the sole signatory to the Underwriting Agreement, which was submitted as Exhibit 1.1 to the Form F.1/A Registration Statement filed by the Company on April 25, 2025. The Underwriting Agreement expressly provides in pertinent part in Section 4(b) under the heading Covenants of the Company that:

> During the period beginning on the date hereof and ending on the later of the Closing Date or such date as, in the reasonable opinion of Underwriters' Counsel, the Prospectus is no longer required by law to be delivered (or in lieu thereof the notice referred to in Rule 173(a) under the Securities Act is no longer required to be provided) in connection with sale by an underwriter or dealer (the "**Prospectus Delivery Period**"), prior to amending or supplementing the Registration Statement, the Disclosure Materials or the Prospectus, the Company shall furnish to the Underwriters and Underwriters' Counsel for review a copy of each such proposed amendment or supplement, and the Company shall not file any such proposed amendment or supplement to which the Underwriters reasonably object.

Accordingly, the Underwriter Defendant had the opportunity to review the Registration Statement and Prospectus publicly filed with the SEC.

**B.     The Market Manipulation Scheme Starts to Unfold**

32.     The Company's low-float IPO was carefully designed to facilitate market manipulation and a "pump-and-dump" scheme. By offering just 1.5 million shares to the public,

Company insiders and co-conspirators were able to benefit from the scheme through offshore holding entities and affiliates. The scarce public float allowed for price manipulation because even modest buying pressure could create explosive price movement.

33.    On June 16, 2025, SDM filed on Form S-8, a registration statement, to register up to 5,000,000 ordinary shares, which could be used under the Company's 2025 Equity Incentive Plan. The June 16, 2025, Form S-8 was signed by the Individual Defendants.

34.    Within days of this filing and with no other news or announcements to support it, the Company's stock price began to climb on a significant surge in daily trading volume. On June 20, 2025, the Company's stock price closed at $8.70 per share, *increasing 25.7%* over a closing price of $6.92 at the prior day's close. Moreover, this stark, unexplained rise in share price was accompanied by a *56-fold increase in trading volume*, up to 464,900. On the subsequent trading day, SDM's stock price continued to climb, closing at $10.31 per share, on trading volume of 510,100.

35.    The upward trajectory of the Company's stock price and trading volume continued, reaching a Class Period intraday high of $29.40 per share on July 28, 2025, on trading volume of 918,000. On July 30, 2025, the Company posted its Class Period high closing price of $26.00 per share on volume of 701,000.

36.    Following a month's long upward trajectory and again, based on no news, announcement or filing from or involving SDM, the Company's stock price cratered over the subsequent week on daily trading volumes close to or exceeding 1,000,000, down to $10.17 per share on August 8, 2025.

37.    Although public filings and news were scarce, a coordinated effort was made on social media and messaging applications, such as WhatsApp, to "pump" SDM led by stock

promoters posing as financial advisors. Based on information and belief, these stock promoters, among the John Does 1-100 Defendants, used aliases and false photographs to conceal their true identities and were key cogs in the stock manipulation scheme surrounding SDM, along with Defendants identified herein.

38.     These stock promoters targeted investors on social media via advertisements and posts, which solicited them to join a stock trading and tips "groups" on messaging applications. One such group was labeled "75 Market Hot Spot Tracking Group" and marketed as the "Liz Ann Sonders investment group." After an initial solicitation, when an investor contacted the group about joining, a stock promoter posing as a financial advisor would tout prior returns to convince the investor to follow their advice and join the group. For instance, in one message, a stock promoter touted that the trading group achieved a "Total Profit Percentage" of "156.39%" by trading in Applied Optoelectronics, Inc. (NASDAQ: AAOI) within the assigned "Purchase Date" and "Sell Date." In another instance, the impersonator touted a "Total Profit Percentage [of] 134%-136%" on trades of Nebius Group N.V. (NASDAQ: NBIS) within the assigned "Purchase Date" and "Sell Date." Along with touting these results, the stock promoters advertised new investment opportunities, such as SDM, and emphasizing the expectation that investment would return profits of "180%-260%."

39.     Once the investor joined the group, a stock promoter, posing as a financial advisor, would provide false and misleading information regarding the Company's stock and its potential, and encourage the investor to "maximize" their funds to achieve the largest profit. When investors confirmed that they purchased stock as instructed by the stock promoters, the stock promoter instructed the investor to provide screenshots of their transactions illustrating their ownership of

SDM. For example, these messages from stock promoters included and were similar to the following:





**Hannah Hickey**
widziano wczoraj o 17:30

Sir, I've heard our institution is calculating the funds for today's purchases and is preparing to add more chips around $14.50 to maximize the gains from this Eagle 6. I believe this decision will instill confidence in more investors. I've also increased my position. 🙌🙌

So you can also increase your buying power based on the limit price of 14.40 and enter a position at a lower price to achieve higher profits.                    14:03

Before the market opened, SDM released positive news, detailing the smooth progress of its cryptocurrency business. These positive developments are expected to push SDM's stock price to a higher level, and SDM's stock price will continue to rise from the current level. 🥳🥳                    14:37

40.     These stock promoters also provided investors with power point presentations specifically concerning SDM, which were materially false and misleading. For example, one such power presentation included the following slides regarding SDM:









41.     These slides included representations touting the Company's increased "flexibility and capital turnover efficiency, enabling it to respond more quickly to market change[,]" "combination of services [as] sticky and difficult to replace in the local market[,]" and the "competitive advantage" of "local market experience in Singapore, China and Macau." Further, the slides discuss a "M&A Opportunity with HubSpot" that "will enable global market expansion through complementary strengths, create a complete end-to-end solution, improve operational efficiency based on data and technology, and create win-win synergies in terms of financial returns and brand influence." The presentation also explains that SDM's "majority shareholder has begun to gradually increase its stake[,]" and that "market capitalization is expected to grow to $1.2-$1.5 billion and [SDM's] share price is expected to reach the $45-$55 range after the acquisition is completed."

42.     The stock promoters would reinforce the power point presentation slides in discussing SDM with investors. For instance, a stock promoter in discussing the purported "M&A Opportunity" told an investor that "our investment research team **held another online meeting with SDM's senior management** [and] [t]he company continues to deepen its collaboration with HUBS, a renowned industry peer." (emphasis added.). Further, the promoter explained that

"HUBS not only fully shares its technology with SDM but also incorporates HUBS's business model and strategy into the partnership."

43.     The statements identified above in paragraphs 38 through 42 were and are false and misleading because the statements failed to disclose that: (1) SDM was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) insiders and/or affiliates used and/or intended to use offshore or nominee accounts to facilitate the coordinated dumping of shares during a price inflation campaign; (3) SDM's public statements and risk disclosures omitted any mention of intention to use fraudulent trading or market manipulation used to drive the Company's stock price; (4) that, as a result, SDM securities were at unique risk of a sustained halt in trading by either of the SEC or NASDAQ; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

**Regulators Take Aim at Companies Similar to SDM**

44.     While the market manipulation scheme was in progress and attempts to "pump" SDM securities were underway, regulators were aligning their efforts to curtail such manipulation on U.S. stock exchanges.

45.     On September 3, 2025, the NASDAQ issued a press release entitled "NASDAQ PROPOSED CHANGES TO ITS LISTING STANDARDS[,]" in which NASDAQ announced proposals aimed at regulating micro-cap, low public float companies, like SDM, that had increasingly become vehicles of fraud. The press release stated the following in pertinent part:

> Today, Nasdaq proposed a new set of enhancements to its initial and continued listing standards, reinforcing its long-standing commitment to capital formation while ensuring investor protection and upholding market integrity. These proposed updates introduce

enhanced requirements for minimum company public float and capital raised during initial public offerings, alongside stricter suspension and delisting procedures for companies failing to meet Nasdaq's continued listings standards.

The revised standards include:

- A $15 million minimum market value of public float, applicable to new listings on Nasdaq under the net income standard.
- An accelerated process for suspending and delisting companies with a listings deficiency that also have a Market Value of Listed Securities below $5 million.
- A $25 million minimum public offering proceeds requirement for new listings of companies principally operating in China.

"*Investor protection and market integrity are central to Nasdaq's mission*," said John Zecca, Executive Vice President and Global Chief Legal, Risk & Regulatory Officer. "These enhancements reflect our ongoing commitment to evolve our standards in step with market realities and to lead by example in promoting fair and orderly markets. By increasing our standards for the minimum public float and the public offering raise in certain new listings, it provides a healthier liquidity profile for public investors, while still making emerging companies available to investors through our exchange. These new listing standards represent one step in a necessary, industry-wide effort—alongside regulators, U.S. exchanges, and market participants—to closely examine trading behaviors in small company securities, with the goal of safeguarding market integrity and enhancing protections for investors."

*The actions announced today follow Nasdaq's proactive review of trading activity, particularly emerging patterns associated with potential pump-and-dump schemes in U.S. cross-market trading environments.* The proposed updates are also reflective of how market dynamics and company valuations have evolved over time, prompting the need to recalibrate Nasdaq's minimum liquidity standards to suit today's environment. These enhancements ensure that the thresholds for public listings remain relevant and effective as markets evolve.

As part of these changes, Nasdaq is reintroducing a minimum public offering proceeds requirement specifically for companies principally operating in China, building on previous standards set

for "restrictive markets," in which the Public Company Accounting
Oversight Board (PCAOB) could not inspect auditors.[1] By applying
this threshold, Nasdaq strengthens investor protections and
enhances the liquidity profile of companies to reflect today's market
environment.

In addition to the enhanced listing standards, ***Nasdaq will continue
to actively refer cases to the Securities and Exchange
Commission (SEC) and the Financial Industry Regulatory
Authority (FINRA) on potentially manipulative trading activities,
while strengthening our cooperation with both domestic and
international regulators to reinforce effective oversight and
maintain high standards across U.S. markets.***

(emphasis added.)

46.    Accordingly, NASDAQ was seeking to implement more rigid standards on

companies with the profile of SDM and cooperating with both the SEC and the Financial Industry

Regulatory Authority ("FINRA") to identify manipulative trading activities.

47.    On September 5, 2025, the SEC issued a press release, which announced "the

formation of a task force that will strengthen and enhance the Division of Enforcement's efforts to

identify and combat cross-border fraud harming U.S. investors." In the release, the SEC explained,

in pertinent part, that "[t]he Cross-Border Task Force will focus initially on investigating potential

U.S. federal securities laws violations related to foreign-based companies, including potential

market manipulation, such as 'pump-and-dump' and 'ramp-and-dump' schemes."

48.    On September 12, 2025, the U.S. Department of Justice ("DOJ") issued a press

release entitled "Co-CEO of Chinese Publicly Traded Technology Company and Financial

Advisor Indicted for Over $100M Securities Fraud Scheme," which stated the following, in

pertinent part:

According to the indictment, Lai Kui Sen is the co-CEO of OST,
and Yan Zhao, who goes by the aliases Hank Shi and Hank Shu,
among others, is a financial advisor. ***OST is a Cayman Islands***

*company with its principal operations in China*, that claimed to be a manufacturer of display modules used in consumer electronics, commercial LCD displays, and automotive displays. OST is publicly traded on NASDAQ and operated, at one point, with a variable interest entity (VIE) investment structure, which is often used by Chinese companies.

According to the indictment, Sen, Zhao, and others allegedly engaged in a *complex scheme to first provide a group of fifteen co-conspirators with tens of millions of OST shares through two non-bona fide securities transactions.* In one of these transactions, these co-conspirators paid nothing to OST for more than 70 million OST shares.

The indictment alleges that, *on April 15, 2025, the same day that the select investors received their first tranche of heavily discounted OST shares, a fraudulent campaign began to artificially inflate the price and trading volume of the OST stock. This included promoting the stock by impersonating real investment advisors, among others, promoting the stock on social media, and creating a false impression of market-wide buying momentum.* To capitalize on OST's artificial price inflation and to harm the victim investors, Zhao and Sen facilitated the opening of brokerage accounts for certain select investors and orchestrated the selling of the shares that they had received either heavily discounted or for no remuneration. *These sales generated substantial profits of approximately more than $110 million. Ultimately, according to the indictment, unwitting investors suffered significant losses when, on June 26, 2025, OST lost over $950 million in market capitalization, representing over 94% of its value.*

(emphasis added.)

49.    On September 17, 2025, the SEC filed its Verified Opposition to Petitioner's

Motion to Quash Subpoena under the Right to Financial Privacy Act of 1978 in the matter of

*Peiyong v. U.S. Securities and Exchange Commission*, Case No. 1:25-mc-00350 (ECF No. 7).[1]

Therein, the SEC stated the following, in pertinent part:

---

[1] On January 13, 2023, the SEC issued a Formal Order Directing Private Investigation and Designating Officers to Take Testimony in *In the Matter of Market Manipulation in Certain IPOs* (HO-14588) (the "Formal Order"). The Formal Order states that the SEC has information that tends to show that "U.S. Broker Dealers[,]" "Issuers[,]" "Hong Kong Broker-Dealers[,]" and "other persons and entities" may

SEC Staff is investigating whether ***dozens of IPOs registered with the SEC and trading on U.S. exchanges between 2020 and 2025 (the "Relevant Offerings") were used as vehicles in a suspected IPO manipulation scheme ("Suspected IPO Manipulation Scheme") orchestrated by the persons and entities with ties to Hong Kong and China (the "Syndicate").*** In the days, weeks, and/or months following its IPO, each issuer's securities ***experienced unusual, extreme, and unexplained price movements, generally consisting of a large upward price spike followed by a drop to a price far below the high and often below the offering price.*** Today, these issuers' securities typically trade at a fraction of the offering price.

SEC Staff's investigation indicates that ***the unusual price movements following the Relevant Offerings may have resulted from illegal market manipulation that the Syndicate orchestrated.*** Specifically, SEC Staff has information that tends to show that:

•       individuals and entities affiliated with the Syndicate acquired most of the issuers' public float by purchasing shares in many Relevant Offerings;

•       shortly after the Relevant Offerings, anonymous third parties on the Internet convinced investors to purchase the issuers' securities at prices substantially higher than they were offered; and

•       the accounts under the Syndicate's control that participated in the Relevant Offerings sold the issuers' shares at a significant profit into the bubble the solicitations created.

(emphasis added.)

50.     Later, on October 7, 2025, United States District Court Judge Dale E. Ho denied the Motion to Quash and granted enforcement of the subpoena. In his Memorandum Order, the Honorable Judge Ho explained that the SEC clearly linked the petitioner to its investigations, noting that the petitioner "appears to have also received significant proceeds from the Suspected IPO Manipulation scheme from other suspected [scheme] members," including "an entity in which

---

have been or may be engaging in violations of the federal securities laws including Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

[he] purchased a 40% ownership interest in," and that one alleged entity connected with the scheme "disbursed a significant portion of . . . funds to other accounts related to Petitioner," including "one of [his] personal bank accounts."[2]

51.     Accordingly, regulators had identified companies with a similar profile to SDM - recently IPOed, micro-cap companies with ties to China and miniscule public floats - as, at minimum, problematic for investors, and at most, vehicles specifically designed to deceive investors, commit securities fraud, and market manipulation. Further, the SEC and DOJ were actively investigating and pursuing enforcement proceedings against potential co-conspirators and perpetrators of securities fraud via an IPO stock manipulation scheme similar to that alleged herein.

### C.    Defendants Make Additional Material Misrepresentations and Omissions

52.     On September 22, 2025, the Company filed on Form 6-K with the SEC reporting the Company's financial results for the six months ended March 31, 2025. Therein, the Company reported total revenue of approximately $14.5M for the six months ended March 31, 2025, relative to $8.2M for the six months ended March 31, 2024, and net income of $0.4M for the six months ended March 31, 2025, compared to $0.2M for the six months ended March 31, 2024. Defendant Chen signed the Form 6-K. Further, the Company stated the following:

> ***The Company has evaluated subsequent events through September 22, 2025***, the date the financial statements were issued and filed with the U.S. Securities and Exchange Commission. ***Based on the Company's evaluation, no other event has occurred requiring adjustment or disclosure in the notes to the consolidated financial statements***, except the following:
> On May 5, 2025, the Company closed its initial public offering of 1,500,000 ordinary shares at a public offering price of $4.00 per

---

[2] At this time, Plaintiff lacks sufficient information linking Han Peiyong or his affiliates directly to SDM and accordingly, cannot name Mr. Peiyong in connection with this Complaint, however, discovery could yield more information regarding Mr. Peiyong's (or others') involvement in the alleged violations of law specific to SDM and in turn, Mr. Peiyong and/or his affiliates (or other similar persons and affiliates) could be named as a Defendant or Defendants in an amended pleading.

share for a total of $6,000,000 in gross proceeds. The Company raised total net proceeds of $4,980,000 after deducting underwriting discounts and commissions and offering expenses. In addition, the Company granted to its underwriters an option for a period of 45 days after the closing of the initial public offering to purchase up to an additional 225,000 ordinary shares at the public offering price, less underwriting discounts.

The ordinary shares were previously approved for listing on The Nasdaq Capital Market and commenced trading under the ticker symbol "SDM" on May 2, 2025.

On May 7, 2025, the Company closed the sale of an additional 225,000 ordinary shares, par value $0.001 per share, pursuant to the full exercise of the over-allotment option granted to the underwriters in connection with the Company's initial public offering, at the public offering price of $4.00 per share. As a result, the Company raised additional gross proceeds of $900,000, before deducting underwriting discounts and offering expenses.

On June 16, 2025, the Board of Directors of the Company approved the 2025 Equity Incentive Plan. The Plan reserves 5,000,000 ordinary shares for issuance pursuant to awards such as stock options, restricted shares, restricted share units, and other equity-based awards. The Plan is intended to support the Company's long-term growth by attracting and retaining key personnel.

(emphasis added.)

On this news, the Company's stock price climbed from a closing price of $13.81 per share on September 19, 2025, to a closing price of $14.85 per share on September 22, 2025.

53.    Next, on September 23, 2025, pre-market, SDM issued a press release entitled "Smart Digital Group Announces Plan to Establish A Diversified Cryptocurrency Asset Pool"[3] that stated the following:

On September 19, Smart Digital Group Limited (Nasdaq: SDM) (the "Company") announced its plan to establish a

---

[3] Notably, this statement is also false and misleading because SDM did not make any announcement on September 19, 2025, regarding the Company's intention to establish a diversified cryptocurrency asset pool, or otherwise.

> diversified cryptocurrency asset pool, with a strategic focus on investing in cryptocurrencies such as Bitcoin and Ethereum. The initiative emphasizes assets that demonstrate stability, transparency, and alignment with the Company's long-term strategic goals.
>
> This move is designed to strengthen the Company's position in the digital asset ecosystem while leveraging the growing acceptance of cryptocurrencies in global markets. By allocating resources to established and transparent digital assets, the Company aims to enhance portfolio diversification and capture value in the evolving digital economy.
>
> Smart Digital Group Limited will implement a structured approach to manage and safeguard its cryptocurrency holdings, incorporating robust risk management and compliance protocols. Further details regarding the size and allocation of the asset pool will be communicated in accordance with regulatory requirements and market conditions.

On this news, the Company's shares climbed again over the next two trading days from a closing price of $14.85 per share on September 22, 2025, to close at $15.61 per share on September 23, 2025, and then, $16.01 per share on September 24, 2025.

54.    On September 26, 2025, before the market opened, SDM issued a press release announcing its intention to establish a "diversified cryptocurrency asset pool, with a strategic focus on investing in cryptocurrencies such as Bitcoin and Ethereum." The press release specifically stated the following:

> Smart Digital Group Limited (Nasdaq: SDM) today announced ***its plan to establish a diversified cryptocurrency asset pool, with a strategic focus on investing in cryptocurrencies such as Bitcoin and Ethereum. The initiative emphasizes assets that demonstrate stability, transparency, and alignment with the company's long-term strategic goals.***
>
> This move is designed to strengthen Smart Digital Group position in the digital asset ecosystem while leveraging the growing acceptance of cryptocurrencies in global markets. By allocating resources to established digital assets, the company aims to enhance portfolio diversification and capture value in the evolving digital economy.

Smart Digital Group Limited will implement a structured approach to manage and safeguard its cryptocurrency holdings, incorporating robust risk management and compliance protocols. Further details regarding the size and allocation of the asset pool will be communicated in accordance with regulatory requirements and market conditions.

(emphasis added.)

55.     The statements identified above in paragraphs 52-54 were and are false and misleading because the statements failed to disclose that: (1) SDM was the subject of a market manipulation and fraudulent promotion scheme involving social-media and messaging application based misinformation and impersonators posing as financial professionals; (2) SDM's stock had already experienced a severe run-up based on unexplained fluctuations in trading volume that was typical of a market manipulation and fraudulent promotion scheme; (3) insiders and/or affiliates used and/or intended to use offshore or nominee accounts to facilitate the coordinated dumping of shares during a price inflation campaign; (4) as a result, SDM securities were at unique risk of a sustained suspension of trading by either of the SEC or NASDAQ; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

## D.    The Truth Is Revealed

56.     Within minutes of the market opening and the publication of the press release on September 26, 2025, regarding the Company's cryptocurrency plan, the Company's stock price began to climb and volume in the Company's stock spiked with over 270,000 orders at 9:33 AM alone. This volume of activity amounted to approximately 30% of the Company's average daily trading volume in a single minute. In response, NASDAQ temporarily halted trading in the Company's stock at 9:34 AM due to volatility. NASDAQ permitted trading to resume at 10:49 AM.

57.    After the resumption of trading, the stock manipulation scheme was exposed as SDM's stock price collapsed with investors suffering heavy losses. SDM's stock price resumed trading initially at just $2.27 per share before eventually closing at $1.85 per share on record daily trading volume of 25.9M. On the crash, SDM's stock price lost 88% of its value from its prior day closing price of $13.61.

58.    The truth was further revealed after the market's close on September 26, 2025, when the SEC announced "the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934, of trading in the securities of Smart Digital Group Limited[.]" The SEC explained that the temporary suspension was due to "potential manipulation in the securities of SDM effectuated through recommendations made to investors by unknown persons via social media to purchase the securities of SDM, which appear to be designed to artificially inflate the price and volume of the securities of SDM." The suspension of trading in SDM was ordered for the period from 4:00 AM EST on September 29, 2025, through 11:59 PM EST on October 10, 2025.

59.    On October 8, 2025, SDM filed on Form 6-K with the SEC a Report of Foreign Private Issuer finally acknowledging the suspension. The Company's filing stated:

> **Suspension of Trading**
>
> On September 26, 2025, Smart Digital Group Limited (the "Company") received from the U.S. Securities and Exchange Commission (the "SEC") an order suspending trading in the Company's securities for the period from 4:00 AM ET on September 29, 2025, through 11:59 PM ET on October 10, 2025, which order is available at https://www.sec.gov/files/litigation/suspensions/2025/34-104112.pdf. On September 30, 2025, the Company received an information request from The Nasdaq Stock Market LLC ("Nasdaq") for certain information and documents. The Company has not participated in any price manipulation activity and will fully cooperate with both the SEC and Nasdaq.

60.     The truth continued to emerge on October 11, 2025, when the NASDAQ announced that trading in SDM would remain suspended pending receipt of "additional information requested from the company." Despite the Company's denial of involvement in market manipulation and statement that it intends to "fully cooperate with both the SEC and Nasdaq[,]" trading in the Company's stock remains halted by the NASDAQ pending the information request, which was first issued on September 30, 2025.

61.     On October 24, 2025, SDM filed on Form 6-K with the SEC a Report of Foreign Private Issuer, which stated, in pertinent part:

> ### *Resignation of Previous Chief Financial Officer*
>
> Smart Digital Group Limited (the "Company") received the resignation letter of its Chief Financial Officer ("CFO"), Ms. Qiongshan Huang, effective October 20, 2025. Mr. Huang's resignation was not related to the Company's financial or operating results or to any disagreements or concerns regarding the Company's financial or reporting practices.

62.     SDM stock remains halted from trading through the date of this filing.

**E.     The Contemporaneous Suspension of Trading in QMMM Amid Similarities to SDM**

63.     SDM was not the only NASDAQ-traded stock suspended from trading by the SEC before trading opened on September 29, 2025. Contemporaneously with SDM, the SEC also suspended trading in QMMM Holdings Limited ("QMMM") between September 29, 2025, at 4:00 AM EST and October 10, 2025, at 11:59 PM EST. In the announcement, the SEC explained in substantially identical language that trading in the securities of QMMM was suspended due to "potential manipulation in the securities of QMMM effectuated through recommendations, made to investors by unknown persons via social media to purchase the securities of QMMM, which appear to be designed to artificially inflate the price and volume of the securities of QMMM."

64.     This similarity was neither isolated, nor coincidental. QMMM completed its IPO of 2.15M shares, raising $8.6M at an offering price of $4.00 per share on July 18, 2024. QMMM is purportedly an award-winning digital advertising and marketing production services company, which is incorporated in the Cayman Islands with principal executive offices located in Hong Kong. Accordingly, similar to SDM, QMMM was a recent, micro-cap IPO with an opaque business model, incorporated in the Cayman Islands, and with connections to China.

65.     Further, QMMM was also the subject of a significant illicit stock promotional effort on social media and across messaging applications. As with SDM, investors were solicited by individuals posing as financial advisors and provided with false and misleading information regarding QMMM, aimed at driving up the stock price and creating a universe of buyers willing to purchase QMMM stock at artificially inflated prices.

66.     On September 9, 2025, QMMM issued a press release announcing its intention "to establish a *diversified cryptocurrency treasury initially targeting Bitcoin, Ethereum, and Solana (SOL).*" QMMM stated, in pertinent part, that "[t]he treasury, which is expected to reach an initial scale of US$100 million, will serve as a *foundation for both stability and transparency*." On this news, the price of QMMM stock surged from a closing price of $11.57 per share on September 8, 2025, to close at $207.00 and trade as high as $303.00 intraday on September 9, 2025.

67.     However, on September 10, 2025, QMMM's stock crashed back down to a closing price of $109.50, a loss of 47.1% off the prior day's closing price. The sell-off of QMMM stock continued through September 15, 2025, when it closed at $71.75 per share and stabilized thereafter.

68.     The SDM press releases issued on September 23 and September 26, 2025, were substantively identical to QMMM's September 9, 2025, press release, and intended to trigger a run-up of the Company's stock price. However, SDM stock was halted by the NASDAQ on the

morning of September 26, 2025, as the volume spike began, stopping the momentum and revealing the fraud. Before trading opened on the next trading day, both SDM and QMMM were suspended from trading by the SEC.

69.      On October 11, 2025, NASDAQ announced that trading would be halted in QMMM until QMMM fully satisfied NASDAQ's request for additional information. NASDAQ took the exact same stance and used substantially identical language with respect to SDM.

70.      On November 24, 2025, QMMM filed on Form 6-K with the SEC a Report of Foreign Private Issuer, which announced that Mr. Cheung Yee Man Irving resigned as an independent director of QMMM's Board of Directors and was replaced by Lui Kwok Wai.

71.      At the time of this filing, neither SDM, nor QMMM has resumed trading, and each experienced leadership departures during the suspension of trading and while NASDAQ conducts its investigation.

## V.      AUDITOR DEFENDANT ALLEGATIONS

72.      The Auditor Defendant certified in the Prospectus and as part of the Registration Statement that "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the company as of September 30, 2024 and 2023 and the results of its operations and cash for each of years ended September 30, 2024 and 2023, in conformity with the account principles generally accepted in the United States of America ('U.S. GAAP')." Additionally, the Auditor Defendant stated the following:

> Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation

of the consolidated financial statement. We believe that our audits
provide a reasonable basis for our opinion.

73.    In issuing its audit opinion on SDM's financial statements, the Auditor Defendant

failed to comply with U.S. Generally Accepted Accounting Principles ("GAAP") or the standards

of the Public Certified Accounting Oversight Board ("PCAOB") requirements. These standards

required the Auditor Defendant to exercise due professional care in the performance of the audit

and to obtain competent, sufficient evidentiary matter to form a basis for their opinion, and to

obtain reasonable assurances that the financial statements were free from material misstatement,

whether caused by error or fraud.

74.    In conducting its audits, the Auditor Defendant had access to the files and key

employees of the Company at all relevant times. The Auditor Defendant had continuous access to

and knowledge of the Company's confidential internal, corporate, financial, operating and

business information, and had the opportunity to observe and review SDM's business and

accounting practices, and to test the Company's internal accounting information and publicly

reported financial statements. Accordingly, the Audit Defendant was aware of the significant

deficiencies at the Company. Thus, if the Auditor Defendant had complied with PCAOB standards,

it would have determined that there was no reasonable basis for its audit report because, among

other things, the Auditor Defendant was aware of undisclosed facts tending to seriously undermine

the accuracy of its audit report and conformity with GAAP and the Company's reported financial

metrics.

## VI.    CLASS ACTION ALLEGATIONS

75.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased

or otherwise acquired SDM securities between May 5, 2025, and September 26, 2025, inclusive,

and who were damaged thereby. Excluding from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which the Defendants have or had a controlling interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SDM's shares actively traded on the NASDAQ. While the exact number of Class Members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of SDM shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by SDM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

77.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

78.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

79.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   a.     whether the federal securities laws were violated by Defendants' acts as
          alleged herein;

b.        whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of SDM; and

c.        to what extent the members of the Class have sustained damages and the proper measure of damages.

80.       A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.    UNDISCLOSED ADVERSE FACTS

81.       The market for SDM securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and misleading statements and/or failures to disclose, SDM securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired SDM securities relying upon the integrity of the market price of the Company's securities and market information relating to SDM and have been damaged thereby.

82.       Throughout the Class Period, Defendants materially misled the investing public thereby inflating the price of SDM securities, by publicly issuing false and/or misleading statements and/or omitting to disclose the material facts necessary to make Defendants' statements, as set forth herein, not false or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about SDM's business, operations and prospects as alleged herein.

83.     At all relevant times, the material misrepresentations and omissions particularized in the Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SDM's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company, its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements and omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## VIII.   LOSS CAUSATION

84.     Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the economic loss suffered by Plaintiff and the Class.

85.     During the Class Period, Plaintiff and the Class purchased SDM's securities at artificially inflated prices and were damaged thereby. The price of SDM's securities significantly declined when the misrepresentations made to the market, and/or the information alleged to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## IX.    SCIENTER ALLEGATIONS

86.     As alleged herein, Defendants acted with scienter because Defendants: (1) knew that the public documents and statements issued or disseminated in the name of SDM were materially false and/or misleading; (2) knew that such statements or documents would be issued or disseminated to the investing public; and (3) knowingly and substantially participated or

acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding SDM, their control over, and/or receipt and/or modification of SDM's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

87.    The market for SDM's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, SDM's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of SDM's securities and market information relating to the Company, and have been damaged thereby.

88.    During the Class Period, the artificial inflation of SDM's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SDM's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of SDM and its business, operations, and prospects, thus causing the price of SDM's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements and/or omissions during the Class Period resulted in Plaintiff and

other members of the Class purchasing the Company's securities at artificially inflated prices, and each of them has been damaged as a result.

89.     At all relevant times, the market for SDM securities was an efficient market for the following reasons, among others:

        a.      SDM shares met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient and automated market; and/or

        b.      SDM communicated with public investors through established market communication mechanisms, including through dissemination of press releases on national circuits of major newswire services and through other public disclosures.

90.     As a result of the foregoing, the market for SDM securities promptly digested current information regarding SDM from all publicly available sources and reflected such information in SDM's share price. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of SDM's securities at artificially inflated prices and a presumption of reliance applies.

91.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    NO SAFE HARBOR

92.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in purportedly forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SDM who knew that the statement was false when made.

## **FIRST CLAIM**

### **Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

93.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

94.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase SDM securities at artificially inflated prices. In furtherance

of this unlawful scheme, plan and course of conduct, Defendants and each defendant, took the actions set forth herein.

95.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SDM securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

96.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SDM's financial well-being and prospects, as specified herein.

97.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of SDM's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of materials facts and/or omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

98.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, internal controls and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

99.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SDM's true financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements and/or omissions regarding the Company's business, operations, financial well-being and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

100.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, set forth above, the market price of SDM securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and other members of the Class acquired SDM securities during the Class Period at artificially inflated prices and were damaged thereby.

101.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that SDM was experiencing, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their SDM securities, or, if they had acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

102.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

103.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

104.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

105.    Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

106.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same.

107.    As set forth above, SDM and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other

members of the Class suffered damages in connection with their purchases of the Company's

securities during the Class Period.

## XII.    PRAYER FOR RELIEF

108.    WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the

Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Plaintiff and the other Class

members against all Defendants, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be

proven at trial, including interest thereon;

c.    Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

109.    Plaintiff hereby demands a trial by jury.

Dated: January 13, 2026

**WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP**

/s/ Benjamin Y. Kaufman
Benjamin Y. Kaufman
Matthew M. Guiney
Patrick Donovan
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
kaufman@whafh.com
guiney@whafh.com
donovan@whafh.com

## PLAINTIFF'S CERTIFICATION

**Parijaat S. Dixit** ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized the commencement of a Lead Plaintiff motion on Plaintiff's behalf.

2      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel nor in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony, if necessary.

4.      Plaintiff's transactions in the shares of  Smart Digital Group Limited during the Period specified in the Complaint, are as follows:

### SEE ATTACHED SCHEDULE A

5.      During the three years prior to the date of this Certificate, Plaintiff has not served as a representative party for a class in an action filed under the federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on _____1/12/2026_____.

Signed by:

*Parijaat Dixit*
9E1A5A74373B4AC...

**Parijaat S. Dixit**

**Schedule A to Certification**
**Parijaat S. Dixit**

**Purchases**

| Date | Number of shares | Price per Share |
|---|---|---|
| 09/15/25 | 70,000 | $11.42 |
| 09/15/25 | 500 | $10.81 |
| 09/15/25 | 100 | $11.41 |
| 09/16/25 | 122,600 | $12.04 |
| 09/16/25 | 30,000 | $11.90 |
| 09/16/25 | 30,000 | $11.89 |
| 09/19/25 | 200,000 | $13.80 |
| 09/19/25 | 20,869 | $13.70 |
| 09/22/25 | 85,750 | $13.50 |
| 09/25/25 | 3,170 | $15.80 |

**Sales**

| Date | Number of shares | Price per Share |
|---|---|---|
| 09/18/25 | 253,200 | $14.18 |
| 09/26/25 | 100,000 | $1.74 |
| 09/26/25 | 100,000 | $1.77 |
| 09/26/25 | 100,000 | $1.62 |
| 09/26/25 | 9,789 | $1.61 |