**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PARIJAAT DIXIT and VITO VERGERIO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>SMART DIGITAL GROUP LIMITED, YUNTING CHEN, QIONGSHAN HUANG, SAM WAI HONG, ENROME LLP, US TIGER SECURITIES, INC., TIGER FINTECH HOLDINGS, INC., UP FINTECH GLOBAL HOLDINGS, LTD., UP FINTECH HOLDING, LTD., COGENCY GLOBAL, INC., COLLEEN A. DE VRIES, and JOHN DOES 1-100,<br><br>Defendants. | Case No: 1:26-cv-00296-NRB<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

**FIRST AMENDED COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I. NATURE OF THE ACTION AND OVERVIEW ........ 1
II. JURISDICTION AND VENUE ........ 4
III. PARTIES ........ 5
IV. SUBSTANTIVE ALLEGATIONS ........ 10
A. Defendants Make Material Misstatements and Omissions in SDM's Registration Statement and Prospectus ........ 10
B. The Market Manipulation Scheme Starts to Unfold ........ 33
C. Regulators Take Aim at Companies Similar to SDM ........ 47
D. Defendants Make Additional Material Misrepresentations and Omissions ........ 52
E. The Truth Is Revealed ........ 56
F. The Contemporaneous Suspension of Trading in QMMM Amid Similarities to SDM ........ 58
G. The Underwriter Defendants Are Sanctioned by Chinese Regulators ........ 60
V. AUDITOR DEFENDANT ALLEGATIONS ........ 65
VI. CLASS ACTION ALLEGATIONS ........ 69
VII. UNDISCLOSED ADVERSE FACTS ........ 70
VIII. LOSS CAUSATION ........ 71
IX. SCIENTER ALLEGATIONS ........ 72
X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........ 75
XI. NO SAFE HARBOR ........ 77
FIRST CLAIM ........ 77
Violation of Section 10(b) of The Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against SDM, the D&O Defendants, & the Auditor Defendant ........ 77
SECOND CLAIM ........ 81
Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) & (c) for Fraud in Connection with the Sale or Purchase of a Security Against SDM, D&O Defendants, the Auditor Defendants, the Underwriter Defendants, and the John Doe Defendants ........ 81
THIRD CLAIM ........ 82
Violation of Section 20(a) of the Exchange Act Against the D&O Defendants, Tiger Holdings, Up Fintech Global, and Up Fintech ........ 82
FOURTH CLAIM ........ 83
Violation of § 11 of the Securities Act Against SDM, the D&O Defendants, the Auditor Defendant, the Underwriter Defendants, and the Agent Defendants ........ 83
FIFTH CLAIM ........ 85

SIXTH CLAIM ..... 86

Violation of § 15 of the Securities Act Against SDM, the D&O Defendants, Tiger Holdings, Up Fintech Global, Up Fintech, and the Agent Defendants ..... 86

XII. PRAYER FOR RELIEF ..... 87

JURY TRIAL DEMANDED ..... 87

Lead Plaintiffs Parijaat Dixit and Vito Vergerio ("Lead Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Smart Digital Group Limited ("SDM" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by SDM; (c) review and analysis of information disseminated by Defendants through online forums, group chats, and social media; and (d) review of other publicly available information concerning SDM and similar entities.

## I. NATURE OF THE ACTION AND OVERVIEW

1. Lead Plaintiffs bring this securities class action on behalf of persons or entities who purchased or otherwise acquired publicly traded SDM securities: (1) pursuant and/or traceable to the registration statement and related prospectus (collectively, the Registration Statement") issued in connection with SDM's May 5, 2025, initial public offering ("IPO"); and/or (2) between May 5, 2025, and September 26, 2025, inclusive (the "Class Period") seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. The Company conducts its purported business operations in Singapore, Macau, and Mainland China, through three operating entities: SMART DIGITAL META PTE. LTD., AOSI PRODUCTION CO., LTD., and Xiamen Liubenmu Culture Media Co., Ltd. The operating entities purportedly provide a broad range of services including: (1) event planning and execution services, which consist of drafting event planning proposals, customizing event marketing strategies,

engaging event sponsors and other related services; (2) internet media services, which include developing marketing strategies, designing marketing content, distributing such marketing content on select internet platforms and other related services; (3) software customization and marketing services which enable customers to formulate and implement marketing activities through proprietary software; and (4) business planning and consulting services, which include business development planning, business data analysis, and other related services.

3. The Company is a holding company incorporated in the Cayman Islands. During the Class Period, SDM's principal executive offices were located at 150 Beach Road, #2805/06 Gateway, West Singapore 189720. As of January 12, 2026, the Company claims to have consolidated its administrative and management functions with new executive offices at No. 2615, Xingsheng 1st Road, Hengqin New District, Zhuhai City, Guangdong Province, China. The Company completed its IPO on or about May 5, 2025, selling 1.5 million ordinary shares at an offering price of $4.00 per share, raising $6 million in gross proceeds.

4. This case arises from the sudden collapse of SDM's stock price on September 26, 2025, and the still-pending halt of trading in the Company's securities due to a fraudulent market manipulation scheme that caused the Company's stock price to trade as high as $29.40 per share intraday on July 28, 2025, despite no fundamental news to justify such a spike in the Company's stock price. Investigation and public reports have revealed that SDM was a vehicle utilized in a market manipulation and "pump-and-dump" promotional scheme. Scammers posing as legitimate financial advisors touted SDM in online forums, chat groups, and social media posts with baseless claims to create a buying frenzy amongst retail investors.

5. On September 26, 2025, after opening the day at $14.30 per share, the Company's stock price collapsed 86.4% to close at $1.85 per share following an intraday halt by the NASDAQ

Stock Market (the "NASDAQ") for volatility just minutes after the market opened. Before the next trading day began, the SEC suspended trading in SDM securities from September 29, 2025, through October 10, 2025, due to "potential manipulation" in the Company's securities "effectuated through recommendations made to investors by unknown persons via social media to purchase the securities of SDM, which appear to be designed to artificially inflate the price and volume of the securities of SDM." The SEC cautioned "broker-dealers, shareholders and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company." With the SEC suspension scheduled to expire, on October 11, 2025, NASDAQ suspended trading in SDM securities indefinitely pending a request for additional information. At the time of this filing, trading in SDM securities remains suspended with no end in sight while multiple members of the Company's management have tendered their resignations.

6. Throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and the true nature of the trading activity in the securities. Specifically, Defendants failed to disclose to investors that: (1) SDM was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) SDM's public statements and risk disclosures omitted any mention of intention to use fraudulent trading or the realized risk of market manipulation used to drive the Company's stock price; (3) that, as a result, SDM securities were at unique risk of a sustained halt in trading by either of the SEC or NASDAQ; (4) the Auditor Defendant and Tiger Securities had been involved with numerous foreign microcap public offerings that were utilized in market manipulation schemes; (5) Tiger Securities had been fined and censured by the Financial Industry

Regulatory Authority ("FINRA") in April 2025 for failing to have a reasonable system in place to identify potentially suspicious deposits of thinly traded low-priced securities; (6) the Company lacked proper internal controls over financial reporting and accounting personnel to maintain compliance with GAAP and SEC requirements; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

## II. JURISDICTION AND VENUE

7. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), and Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Exchange Act (15 U.S.C. §78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

9. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), Section 27 of the Exchange Act (15 U.S.C. §78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's agent for service of process and the Underwriter Defendants (defined below) are located in this Judicial District.

10. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and/or indirectly used the means and instrumentalities of interstate commerce, including

the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

11. Lead Plaintiff Parijaat Dixit, as set forth in the previously-filed certification (Dkt. No. 1), incorporated by reference herein, purchased SDM securities during the Class Period and pursuant or traceable to the IPO, and suffered substantial damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12. Lead Plaintiff Vito Vergerio, as set forth in the previously-filed certification (Dkt. No. 18-2), incorporated by reference herein, purchased SDM securities during the Class Period and pursuant or traceable to the IPO, and suffered substantial damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13. Defendant SDM is a Cayman Islands incorporated holding company with principal executive offices in China. The Company's common stock traded on the NASDAQ under the symbol "SDM" during the Class Period and has been halted from trading since September 29, 2025.

14. Defendant Yunting Chen ("Chen") was the Company's Chief Executive Officer at all relevant times. On May 8, 2026, Chen served his letter of resignation on the Company. Chen was replaced by Yiwei Wang.

15. Defendant Qiongshan Huang ("Huang") was the Company's Chief Financial Officer at all relevant times. On October 20, 2025, Huang served her letter of resignation on the Company. Huang was replaced by Tan Kwang Leng.

16. Defendant Sam Wai Hong ("Hong") was the Company's Chairman of the Board of Directors at all relevant times. On May 9, 2026, Hong served his letter of resignation on the Company. Hong was replaced as Chairman of the Board by Lin Kon Fatt.

17. Defendant Enrome LLP ("Enrome" or the "Auditor Defendant") has served as the Company's auditor since 2023.

18. Defendant US Tiger Securities Inc. ("Tiger Securities") served as the Company's underwriter in connection with its May 5, 2025, IPO. Tiger Securities is headquartered within this District and is a wholly owned (100%) subsidiary of Defendants Tiger Holdings, Up Fintech Global, and Up Fintech.

19. Defendant Tiger Fintech Holdings, Inc. ("Tiger Holdings") is the 100% owner and parent company of Defendant Tiger Securities. Tiger Holdings is incorporated in the State of Delaware and is a wholly owned subsidiary (100%) of Defendants Up Fintech Global and Up Fintech.

20. Defendant Up Fintech Global Holdings, Ltd. ("Up Fintech Global") is the 100% owner and parent company of Defendants Tiger Holdings and Tiger Securities. Up Fintech Global is incorporated in the British Virgin Islands ("BVI") and is a wholly owned subsidiary (100%) of Defendant Up Fintech.

21. Defendant Up Fintech Holding, Ltd. ("Up Fintech") is a Cayman Islands incorporated holding company that is the 100% owner and parent company of Defendants Up Fintech Global, Tiger Holdings, and Tiger Securities. Up Fintech is headquartered in Singapore, with offices and operations in Australia, China, as well as this District. Up Fintech's common stock is listed on NASDAQ trading under the symbol "TIGR."

22. Defendant Cogency Global, Inc. ("Cogency") was the Company's agent and authorized United States representative at all relevant times.

23. Defendant Colleen A. De Vries ("De Vries") was the Company's authorized representative in the United States and a Senior Vice President of Defendant Cogency. De Vries signed the Registration Statement on April 25, 2025, approving it for issuance.

24. Defendants John Does 1-100 ("John Doe Defendants") are co-conspirators in the market manipulation scheme, whose true identities can only be ascertained following discovery, but include and are not limited to members of the so-called "Syndicate" as referred to in the SEC's court filings in *Peiyong v. U.S. Securities and Exchange Commission,* Case No. 1:25-mc-00350 (S.D.N.Y.) (Dkt. No. 7), as well as stock promoters using social media and messaging applications, and additional, unidentified underwriters involved in the stock manipulation scheme.

25. Defendants Chen, Huang, and Hong (collectively, the "D&O Defendants"), because of their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to the market. The D&O Defendants were provided with copies of the Company's public filings, reports, and press releases alleged herein to be materially misleading prior to, or shortly after, their issuance and had the ability, opportunity, and obligation to prevent their issuance or promptly correct them. Because of their positions and access to material non-public information available to them, the D&O Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and/or misleading. The D&O Defendants are liable for the false statements pleaded herein.

26. The Auditor Defendant issued a clean audit opinion on the Company's financial statements incorporated into the Registration Statement issued in connection with the Company's

May 5, 2025, IPO. Additionally, Defendant Enrome was SDM's auditor throughout and for years prior to the Class Period and had access to material non-public information. Because of its position, Enrome knew or should have known that the adverse facts alleged herein had not been disclosed to and were being concealed from the investing public and that the positive representations being made were materially false and/or misleading. Furthermore, due to its position, Defendant Enrome had the ability and opportunity to prevent issuance of fraudulent SEC filings or cause them to be corrected. Therefore, the Auditor Defendant is also liable for the materially false and misleading statements and omissions pleaded herein.

27. The Auditor Defendant served as auditor in connection with multiple recent foreign microcap initial public offerings sharing a similar profile to SDM and that have experienced extreme trading volume and price volatility resulting in significant investor losses including, but not limited to: DarkIris Inc., ("DarkIris"), Pitanium Ltd. ("Pitanium"), and Star Fashion Culture Holdings Limited ("Star Fashion"). On September 30, 2025, DarkIris was halted from trading by the NASDAQ and its stock declined from $10.43 per share at open down to $1.29 per share at closing on September 30, 2025. Pitanium, which IPOed in May 2025, experienced an extreme run-up and decline in July 2025 and was in the midst of another decline in October 2025 when the SEC halted trading in the stock from October 6, 2025, through October 17, 2025, and then the NASDAQ halted trading pending an information request, which remains unresolved. Star Fashion conducted its IPO in October 2024 and by late December 2024 and into early January 2025, the stock price rose sharply before declining over 80% on January 22, 2025, from its closing price on January 21, 2025, damaging investors.

28. Defendant Tiger Securities and by extension Tiger Holdings, Up Fintech Global, and Up Fintech, as its parents (collectively the "Underwriter Defendants"), were the sole book-

running manager on the IPO as identified at numerous points throughout the Prospectus (defined below) and the sole representative underwriter and signatory on the underwriting agreement between the Company and the underwriters (the "Underwriting Agreement"), and agreed to conduct the IPO on a firm commitment basis. The Underwriter Defendants, based on their position, had the ability and opportunity to prevent the issuance of fraudulent SEC filings and/or cause them to be corrected. With this authority and by acting as sole book-runner and representative for the underwriters, Lead Plaintiffs and the Class could and did reasonably attribute the materially misleading false statements and omissions contained in the Registration Statement (defined below) to the Underwriter Defendants and accordingly, the Underwriter Defendants are also liable for the false statements and omissions pleaded herein.

29. Tiger Securities and as a result, the Underwriter Defendants as a whole by nature of their relationship, served as underwriter and/or sole book-runner in other recent IPOs of similar foreign, microcap companies that have experienced extreme trading volume and price volatility resulting in significant investor losses including, but not limited to Oriental Rise Holding Ltd., ("ORIS"), DarkIris and ChowChow Cloud International Holdings Limited ("ChowChow"). On October 17, 2024, ORIS conducted its initial public offering at $4.00 per share and within a single trading day, the stock price surged to $155.00 per share, reaching as high as $424.80 per share and a $1.2 billion market capitalization at closing on December 5, 2025, before suffering an 82.66% decline to close at $73.67 per share on then-record trading volume on December 6, 2025. Even following a 20-to-1 reverse stock split in December 2025, ORIS now trades well below $1.00 per share, has a market capitalization of $2.6 million and on April 20, 2026, was notified that NASDAQ intends to delist ORIS ordinary shares. As detailed above, on September 30, 2025, DarkIris was halted from trading by the NASDAQ and its stock declined from $10.43 per share at

open down to $1.29 per share at closing on September 30, 2025. On December 9, 2025, ChowChow was halted from trading by the NASDAQ and saw its stock collapse from $11.77 per share at open down to a closing price of $1.83 per share.

30. Furthermore, on April 25, 2025, just weeks before the SDM IPO, Tiger Securities along with its securities broker affiliate TradeUP Securities Inc., was censured and fined by FINRA for failing to maintain proper anti-money laundering programs designed to detect and report potentially suspicious activity and transactions in thinly traded low-priced securities. Then, on May 22, 2026, *Reuters* reported that China announced a major crackdown on cross-border investment, its intention to punish brokers accused of "illegally moving money to foreign markets, sending their shares plunging[,]" naming UP Fintech subsidiaries and causing a substantial decline in the price of UP Fintech securities.

31. Defendants Cogency and De Vries (the "Agent Defendants") were the Company's agents for service of process in the United States, as required by 17 CFR § 249.250 of the Exchange Act. Through their roles, the Agent Defendants had the ability and opportunity to prevent issuance of the fraudulent Registration Statement and Prospectus, and/or cause them to be corrected. Therefore, they are also liable for the false statements pled herein.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Defendants Make Material Misstatements and Omissions in SDM's Registration Statement and Prospectus

32. The Class Period begins on May 5, 2025, when the Company filed its IPO Prospectus permitting SDM to issue 1,500,000 ordinary shares at an initial offering price of $4.00 per share for a total capital raise of $6M (the "Prospectus"). In the Prospectus dated May 1, 2025, which formed part of the registration statement filed in connection with the IPO (the "Registration

Statement"), the Company described its business as well as financial results for its different services, as follows:

> Our Company is an exempted company incorporated in the Cayman Islands. Our Company has no material operations of its own and conducts its business operations through three operating entities: SMART DIGITAL META PTE. LTD., AOSI PRODUCTION CO., LTD., and Xiamen Liubenmu Culture Media Co., Ltd. The aforementioned operating entities conduct their business activities in Singapore, Macau, and Mainland China, respectively. The operating entities provide a broad range of services including: (1) event planning and execution services, which consist of drafting event planning proposals, customizing event marketing strategies, engaging event sponsors and other related services; (2) internet media services, which include developing marketing strategies, designing marketing content, distributing such marketing content on select internet platforms and other related services; (3) software customization and marketing services, which enable customers to formulate and implement marketing activities through our AOSI PRODUCTION CO., LTD.'s proprietary software; and (4) business planning and consulting services, which include business development planning, business data analysis and other related services.
>
> Our Company's revenue has demonstrated significant growth in the previous two fiscal years. In the fiscal years ended September 30, 2024 and 2023, our revenue was $21,519,072 and $9,702,145, respectively, representing a growth rate of approximately 121.8%. For the same fiscal years, event planning and execution services accounted for approximately 7.3% and 30.4% of our total revenue, respectively; internet media services accounted for approximately 88.2% and 21.5% of our total revenue, respectively; software customization and marketing services accounted for approximately 0% and 9.6% of our total revenue, respectively; and business planning and consulting services accounted for approximately 4.5% and 38.5% of our total revenue, respectively. For the same fiscal years, our net income was $1,696,654 and $1,993,262, respectively. We did not generate any revenue from software customization and marketing services in the fiscal year ended September 30, 2024 primarily because of the strategic shift in our business focus to internet media services.

33. The Prospectus also contained financial results for fiscal 2023 and 2024, as well as the Report of Independent Registered Public Accounting Firm signed by Defendant Enrome regarding those financial results. Specifically, Defendant Enrome reported the following:

> Opinion on the Financial Statements
>
> We have audited the accompanying consolidated balance sheets of Smart Digital Group Limited and its subsidiaries (the "Company") as of September 30, 2024 and 2023, and the related consolidated statements of operations and comprehensive income, changes in shareholders' equity, and cash flows for each of the years ended September 30, 2024, and 2023 the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of September 30, 2024 and 2023 and the results of its operations and its cash flows for each of the years ended September 30, 2024 and 2023, in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP").
>
> Basis for Opinion
>
> These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.
>
> We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

> Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statement. We believe that our audits provide a reasonable basis for our opinion.
>
> /s/ Enrome LLP

34. The Prospectus also provided information regarding the Company's purported "Strengths[,]" which included the following:

> ***Visionary operating teams***
>
> The operating teams at the operating entities are composed of relatively young professionals. Such young professionals grew up in the information age and are well-acquainted with the rapid evolution of the internet. They demonstrate insights in digital marketing and various digital and technological innovations, which promotes the operating entities' ability to provide software customization and marketing services and other services in line with the technological and industry trends. Such young professionals also demonstrate understanding of the young generation's habits and preferences, which promotes the operating entities' ability to help customers plan events that appeal to the young target audience. We believe these endeavors will not only enhance the attractiveness and visibility of the operating entities' services but also lead to customer acquisition opportunities.
>
> ***Experienced management team***
>
> Our Company's management team has extensive industry experience. The management team has accumulated comprehensive knowledge and skills in logistics management, finance, business development, marketing and operation planning. See "*Management*."

35. The Prospectus also addressed the Company's purported "Growth Strategies[,]" stating as follows:

> In order to remain competitive in the marketplace, the operating entities are committed to staying informed about market demands, securing skilled human resources, and continuously seeking ways to enhance service efficiency. In the medium to long term, the operating entities have outlined several growth strategies. First, they plan to gradually shift the focus away from event planning and execution services and retain only certain categories of events for which they will continue to provide services, such as industry meetings and cultural performances. Second, they plan to strengthen the internet media services and business planning and consulting services, by improving the quality of services, leveraging digital and technological innovations, and optimizing their business processes. Third, they plan to create cross-selling opportunities and foster synergic growth in their services. Fourth, they may expand into new markets, including but not limited to Malaysia, because Malaysia is geographically close to our Singapore headquarters, demonstrates similarities in user habits and preferences to our existing markets, and remains an overlooked market where the full market potential has yet to be explored. As of the date of this prospectus, the operating entities have not made any plans to introduce new service types and have not entered into any agreements for the expansion into additional markets.

36. The Prospectus also included vague, boilerplate disclosures regarding risk factors that could hypothetically adversely affect the Company and its investors, including the following:

> ***Certain recent initial public offerings of companies with public floats comparable to our anticipated public float have experienced extreme volatility that was seemingly unrelated to the underlying performance of the respective company. We may experience similar volatility, which may make it difficult for prospective investors to assess the value of our Ordinary Shares.***
>
> In addition to the risks addressed below in "— The market price of our Ordinary Shares may be volatile or may decline regardless of our operating performance, and you may not be able to resell your shares at or above the initial public offering price," our Ordinary Shares may be subject to extreme volatility that is seemingly unrelated to the underlying performance of our business. Recently, companies with comparable public floats and initial public offering sizes have experienced instances of extreme stock price run-ups followed by rapid price declines, and such stock price volatility was seemingly unrelated to the respective company's underlying performance. Although the specific cause of such volatility is unclear, our anticipated public float may amplify the impact the actions taken by a few shareholders have on the price of our

Ordinary Shares, which may cause our share price to deviate, potentially significantly, from a price that better reflects the underlying performance of our business. Should our Ordinary Shares experience run-ups and declines that are seemingly unrelated to our actual or expected operating performance and financial condition or prospects, prospective investors may have difficulty assessing the rapidly changing value of our Ordinary Shares. In addition, investors of our Ordinary Shares may experience losses, which may be material, if the price of our Ordinary Shares declines after this offering or if such investors purchase our Ordinary Shares prior to any price decline.

Holders of our Ordinary Shares may also not be able to readily liquidate their investment or may be forced to sell at depressed prices due to low volume trading. Broad market fluctuations and general economic and political conditions may also adversely affect the market price of our Ordinary Shares. As a result of this volatility, investors may experience losses on their investment in our Ordinary Shares. Furthermore, the potential extreme volatility may confuse the public investors of the value of our Ordinary Shares, distort the market perception of our share price and our Company's financial performance and public image and negatively affect the long-term liquidity of our Ordinary Shares, regardless of our actual or expected operating performance. If we encounter such volatility, including any rapid share price increases and declines seemingly unrelated to our actual or expected operating performance and financial condition or prospects, it will likely make it difficult and confusing for prospective investors to assess the rapidly changing value of our Ordinary Shares and understand the value thereof.

*          *          *          *          *

***The market price of our Ordinary Shares may be volatile or may decline regardless of our operating performance, and you may not be able to resell your shares at or above the initial public offering price.***

The initial public offering price for our Ordinary Shares may vary from the market price of our Ordinary Shares following our initial public offering. If you purchase our Ordinary Shares in our initial public offering, you may not be able to resell those shares at or above the initial public offering price. We cannot assure you that the initial public offering price of our Ordinary Shares, or the market price following our initial public offering, will equal or exceed prices in privately negotiated transactions of our Ordinary Shares that have occurred from time to time prior to the completion of our initial public offering. The market price of our Ordinary Shares may

> fluctuate significantly in response to numerous factors, many of which are beyond our control, including:
>
> - actual or anticipated fluctuations in our revenue and other operating results;
> - the financial projections we may provide to the public, any changes in these projections or our failure to meet these projections;
> - actions of securities analysts who initiate or maintain coverage of us, changes in financial estimates by any securities analysts who follow our Company, or our failure to meet these estimates or the expectations of investors;
> - announcements by us or our competitors of significant services or features, technical innovations, acquisitions, strategic partnerships, joint ventures, or capital commitments;
> - price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;
> - lawsuits threatened or filed against us; and
> - other events or factors, including those resulting from war or incidents of terrorism, or responses to these events.
>
> In addition, the stock markets have experienced extreme price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many companies. Stock prices of many companies have fluctuated in a manner unrelated or disproportionate to the operating performance of those companies. In the past, stockholders have filed securities class action litigation following periods of market volatility. If we were to become involved in securities litigation, it could subject us to substantial costs, divert resources and the attention of management from our business, and adversely affect our business.

37. Additionally, the Company issued boilerplate risk disclosures concerning its internal controls and the implementation thereof:

> ***If we fail to implement and maintain an effective system of internal controls, we may be unable to accurately or timely report our results of operations or prevent fraud, and investor confidence***

***and the market price of our Ordinary Shares may be materially and adversely affected.***

Prior to the completion of this offering, we have been a private company with limited accounting personnel. Furthermore, prior to the completion of this offering, our management has not performed an assessment of the effectiveness of our internal control over financial reporting, and our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting. Effective internal control over financial reporting is necessary for us to provide reliable financial reports and, together with adequate disclosure controls and procedures, is designed to prevent fraud.

Our failure to implement and maintain effective internal controls over financial reporting could result in errors in our financial statements that could result in a restatement of our financial statements, cause us to fail to meet our reporting obligations and cause investors to lose confidence in our reported financial information, which may result in volatility in and a decline in the market price of our Ordinary Shares.

Upon the completion of this offering, we will become a public company in the United States subject to the Sarbanes-Oxley Act of 2002. Section 404 of the Sarbanes-Oxley Act of 2002, or Section 404, will require that we include a report of management on our internal control over financial reporting in our annual report on Form 20-F. In addition, if we cease to be an "emerging growth company" as such term is defined in the JOBS Act, our independent registered public accounting firm must attest to and report on the effectiveness of our internal control over financial reporting on an annual basis. Our management may conclude that our internal control over financial reporting is not effective. Moreover, even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm, after conducting its own independent testing, may issue a report that is qualified if it is not satisfied with our internal controls or the level at which our controls are documented, designed, operated or reviewed, or if it interprets the relevant requirements differently from us. In addition, after we become a public company, our reporting obligations may place a burden on our management, operational and financial resources and systems for the foreseeable future. We may be unable to timely complete our evaluation testing and any required remediation.

During the course of documenting and testing our internal control procedures, in order to satisfy the requirements of Section 404, we

> may identify material weaknesses and deficiencies in our internal control over financial reporting. The PCAOB has defined a material weakness as "a deficiency, or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim statements will not be prevented or detected on a timely basis."
>
> In addition, if we fail to maintain the adequacy of our internal control over financial reporting, as these standards are modified, supplemented or amended from time to time, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404. Generally speaking, if we fail to achieve and maintain an effective internal control environment, we could suffer material misstatements in our financial statements and fail to meet our reporting obligations, which would likely cause investors to lose confidence in our reported financial information. This could in turn limit our access to capital markets, harm our results of operations and lead to a decline in the trading price of our Ordinary Shares. Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud, misuse of corporate assets and legal actions under the United States securities laws and subject us to potential delisting from Nasdaq, to regulatory investigations and to civil or criminal sanctions.

38. With respect to the reasons behind the Company's IPO, the Prospectus stated the following regarding its intentions post-IPO and how it would use the net proceeds:

> The net proceeds from the sale of 1,500,000 Ordinary Shares in this offering will be approximately $3,845,362, after deducting the underwriting discounts, non-accountable expense allowance, and offering expenses payable by us, based on the initial public offering price of $4.00 per Ordinary Share, excluding the number of Ordinary Shares issuable upon the exercise of the over-allotment option granted to the underwriters.
>
> We plan to use the net proceeds we receive from this offering for the following purposes:
>
> - approximately 45% for working capital and other general operations;
> - approximately 28% for business expansion through acquisitions of appropriate media platforms, although as of the date of this prospectus, our Company has not identified,

nor has our Company engaged in any material discussions regarding, any potential target;

- approximately 15% for brand promotion and marketing; and

- approximately 12% for software development.

> The foregoing represents our current intentions based upon our present plans and business conditions to use and allocate the net proceeds of this offering. Our management, however, will have flexibility and discretion to apply the net proceeds of this offering. If an unforeseen event occurs or business conditions change, we may use the proceeds of this offering differently than as described in this prospectus. *See "Risk Factors — Risks Relating to This Offering and the Trading Market — Our management has broad discretion to determine how to use the funds raised in the offering and may use them in ways that may not enhance our results of operations or the price of our Ordinary Shares."*
>
> To the extent that the net proceeds we receive from this offering are not immediately used for the above purposes, we intend to invest our net proceeds in short-term, interest-bearing bank deposits or debt instruments.
>
> In using the proceeds of this offering, we are permitted under PRC laws and regulations to utilize the proceeds from this offering to fund our PRC subsidiaries by making loans or additional capital contributions, subject to applicable government registration and approval requirements. We cannot assure you that we will be able to obtain these government registrations or approvals on a timely basis, if at all. *See "Risk Factors — Risks Relating to Doing Business in the PRC."*

39. The statements identified above in paragraphs 32 through 38 were and are false and misleading because the statements failed to disclose that: (1) SDM was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) SDM's public statements and risk disclosures omitted any mention of intention to use fraudulent trading or the realized risk of market manipulation used to drive the Company's stock price; (3) that, as a result, SDM securities were at unique risk of a sustained halt in trading by either of the SEC or NASDAQ; (4) the Auditor

Defendant and Tiger Securities had been involved with numerous foreign microcap public offerings that were utilized in market manipulation schemes; (5) Tiger Securities had been fined and censured by FINRA just weeks before the IPO on April 25, 2025 for failing to have a reasonable system in place to identify potentially suspicious deposits of thinly traded low-priced securities; (6) the Company lacked proper internal controls over financial reporting and accounting personnel to maintain compliance with GAAP and SEC requirements; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

40. The Auditor and Underwriter Defendants knew of and/or recklessly disregarded the existence of these falsities, enabling the scam by endorsing the IPO, and issuing SDM shares.

41. A simple review of the Company's website listed in the Offering Documents reveals red flags that would have put the Auditor and Underwriter Defendants on notice that the Company's public statements were false and misleading and that the Company's purported operations were illegitimate.[1] There, visitors are greeted with a homepage almost entirely in Chinese with no built-in option for translation:

[1] https://www.sdmmeta.com/.




Clearly, this was not meant for US investors and would have raised red flags to any dutiful auditor, or underwriter.[2]

42. After applying outside translation software to the website, it becomes clear the Company only has a façade of "event planning," "internet media services," "software customization," or "business planning."[3] If anything, it is a platform for foreign scam artists to purchase social media advertising space (including on Meta, X, Tik Tok and LinkedIn) to promote other fake Chinese companies and bogus digital assets—such as Non-Fungible Tokens (NFTs)—

---

[2] Notably, the Company's website was registered on October 18, 2024, mere months before the IPO. *See* https://www.godaddy.com/whois/results.aspx?itc=dlp_domain_whois&domainName=sdmmeta.com

[3] https://www.sec.gov/Archives/edgar/data/2014955/000121390025039463/ea020341216-424b4_smart.htm#T13

to victims through "cooperation platforms" such as Coindesk, Meta Era, ChainCatcher, and Jinse Finance.[4]

43. The Digital Assets and Media Convergence Matrix tabs of the translated website highlight this:[5]




[4] https://www.sdmmeta.com/.

[5] https://www.sdmmeta.com/nftCase.




44. Specifically, on the Digital Assets tab, the Company highlights a sampling of its NFT creations/offerings of "Mechaboy," "Chinese Style Girl," "Chinese Zodiac – Dragon," and "BAYC #7963."[6] After performing a diligent search of the NFT marketplace OpenSea, Lead Plaintiffs' counsel was unable to find any evidence that the "Mechaboy," "Chinese Style Girl," and "Chinese Zodiac – Dragon" NFTs actually exist.[7]

45. The Business section of the Prospectus among other disclosures identifies that these NFT creations fall into the "business planning and consulting services" segment of Company revenue.[8] Note 2 – Significant Accounting policies goes on to disclose this was the largest driver of revenue for the year ended September 30, 2023 (~39% of total revenue):[9]

---

[6] *Id.*

[7] *See* https://opensea.io/

[8] https://www.sec.gov/Archives/edgar/data/2014955/000121390025039463/ea020341216-424b4_smart.htm

[9] *Id*. Note 2 Specifically.

| | For the years ended September 30, | |
|---|---|---|
| | 2024 | 2023 |
| Revenue from internet media services | $ 18,977,645 | $ 2,082,817 |
| Revenue from business planning and consulting services | 977,450 | 3,736,926 |
| Revenue from event planning and execution services | 1,563,977 | 2,950,094 |
| Revenue from software customization and marketing services | — | 932,308 |
| **Total revenue** | **$ 21,519,072** | **$ 9,702,145** |

As there is no evidence that certain of the Company's purported NFT creations actually exist, this financial disclosure was false and amounted to a material misstatement as it significantly altered the total mix of information made available to investors because it was the largest driver of revenue in 2023 and remained significant through 2024 and 2025.[10] The Auditor and Underwriter Defendants knew of and/or recklessly disregarded the existence of these falsities, enabling the scam by endorsing the IPO, and issuing SDM shares.

46. While "event planning" was listed as the second largest driver of Company revenue,[11] the only evidence of an actual event was a Company-published news release from October 2023 titled *Smart Digital invites you to the "HK WEB3 EVOLUTION: APAC HACKTHON FINALE."* The Company published the release on its website:[12]

10 *See* https://pcaobus.org/oversight/standards/auditing-standards/details/AS2105.

11 https://www.sec.gov/Archives/edgar/data/2014955/000121390025039463/ea020341216-424b4_smart.htm. Note 2, specifically.

12 https://www.sdmmeta.com/articleDetails/23.







After following the embedded Registration Link, users are routed to an Eventbrite page that makes no mention of SDM or its affiliates being any sort of "Partner," host, or organizer of the event:[13]

---

13 https://www.eventbrite.co.uk/e/hk-web3-evolution-neo-apac-hackathon-finale-tickets-741276938277?discount=SmartDigital.




If this event even existed, the Company's claimed "Partnership" with it was clearly fraudulent. A diligent search demonstrates that there is no other evidence of an event involving the Company. Thus, the Company's disclosures in the Registration Statement and Prospectus that it was generating millions of dollars per year in "event planning and execution services" were likewise fraudulent.[14] The Auditor and Underwriter Defendants knew of and/or recklessly disregarded the existence of these falsities, enabling the scam by endorsing the IPO, and issuing SDM shares.

47. For "internet media services," the red flags continue with the Registration Statement claiming that a dormant U.K. limited company, ADA Global Industrial Co., Ltd. ("ADA Global"), was SDM's largest customer for 2024, contracting with it for ~$8.3M (67.2M Macanese pataca (MOP)) of "integrated marketing planning plans for the products, business and brand image."[15] These integrated marketing deliverables included "but [were] not limited to: scheme planning, material production optimization," and dissemination on "the Internet platform selected

---

[14] https://www.sec.gov/Archives/edgar/data/2014955/000121390025039463/ea020341216-424b4_smart.htm#T14. (See note 2 of Prospectus – Summary of significant accounting policies for disaggregation of revenue table highlighting this material falsity).

[15] https://www.sec.gov/Archives/edgar/data/2014955/000121390025012115/ea020341211ex10-9_smart.htm.

by [the Company, including but not limited to] Twitter, Instagram, Meta, Youtobe [*sic*], TikTok, Metaera, Coindesk, Blockbeats, Golden wealth, Block rhythm, Planet Daily, et al."[16]

48. A diligent search fails to yield any evidence that ADA Global or its products would benefit from millions of dollars in marketing expenditure. The only evidence of ADA Global's existence is on the U.K. government's company register, which indicates ADA Global has been "dormant" since 2015.[17] The register defines "dormant" to mean the company is "not doing business ('trading') and does not have any other income, for example investments."[18] Furthermore, for "limited" companies like ADA Global, the register explains that a company will be deemed "dormant" if it "had no 'significant' transactions in the financial year."[19] Insignificant transactions are further defined as "filing fees paid to Companies House, penalties for late filing of accounts, and money paid for shares when the company was incorporated."[20]

49. In view of ADA Global's status as, at best, a dormant company that does not engage in significant transactions, SDM's attribution of approximately $8.3M in revenue to "integrated marketing … for [ADA Global's] products, business and brand image" appears to be fraudulent.[21] As a result, approximately 44% of SDM's "Revenue from internet media services," and approximately 39% of its "Total Revenue" for 2024 were materially misstated by this one contract

---

[16] *Id.*

[17] https://find-and-update.company-information.service.gov.uk/company/09269483/filing-history?page=1.

[18] https://www.gov.uk/dormant-company.

[19] *Id.*

[20] *Id.*

[21] https://www.sec.gov/Archives/edgar/data/2014955/000121390025012115/ea020341211ex10-9_smart.htm.

alone.[22] The Auditor and Underwriter Defendants knew of and/or recklessly disregarded the existence of this falsity, enabling the scam by endorsing the IPO, and issuing SDM shares.

50. Adding to the Auditor Defendant's complicity, the "Important Information" tab on SDM's public website dedicates an entire article to an alleged August 22, 2023, meeting between Enrome and the Company, titled *A Visit to Enrome Audit Firm in Singapore | Standing at a New Starting Point, Embracing the Global Market: Exploring IPO Audit Issues and Industry Prospects*.[23]




The Company claims it held "in-depth discussions" with Enrome "[r]egarding the IPO issues that Smart Digital Group Limited is currently developing in the global market."[24] The translated article goes on to detail the meeting:

> Smart Digital Group Limited traveled to Singapore to explain to the Singaporean auditing firm Enrome its active expansion into the global market. This visit to Enrome was also part of preparation for this global expansion, and discussions and exchanges were held on

---

[22] https://www.sec.gov/Archives/edgar/data/2014955/000121390025039463/ea020341216-424b4_smart.htm. Note 2 specifically.

[23] https://www.sdmmeta.com/articleDetails/2.

[24] *Id.*

> IPO auditing issues and industry development, laying a solid foundation for the further development of Smart Digital Group Limited.
>
> The main purpose of this trip to Singapore was to communicate, discuss, and resolve issues related to finance, internal control, and compliance for Smart Digital Group Limited with the auditing firm Enrome. This demonstrated Smart Digital Group Limited's emphasis on audit transparency, cooperation, and financial accuracy. The company is actively expanding into global markets, building healthy partnerships, and improving the quality of its financial reporting, while also striving to prevent and resolve potential audit issues.
>
> As an innovative company, we are committed to providing our customers with high-quality products and services, and have achieved significant growth in the industry. This visit to Enrome Audit Firm will further accelerate our global market expansion and help achieve our strategic goals. Smart Digital Group Limited has always aimed for excellence in quality and forward-looking innovation. Our firm commitment to a global market strategy is also an inevitable choice to seize greater opportunities.

These statements demonstrate Defendant Enrome was aware of the material misstatements, significant deficiencies, and material weaknesses in the Company's financial statements, as far back as at least August 2023. Despite this knowledge, Defendant Enrome issued unqualified audit opinions on the Company's September 30, 2024 and 2023 financial statements incorporated into the Registration Statement and Prospectus making the fraudulent IPO possible.

51. The August 22, 2023, article also contains a photograph of Defendant Chen with other members of the Company and Executives of Defendant Enrome.[25]

[25] *Id*.




52. Other aspects of the Company's webpage include a Login Page that doesn't work, links to webpages that do not exist, and disclosure of fictitious employees, further supporting an inference that the Company was a fraudulent enterprise.

53. For example, the Team Introduction page discloses six cartoon employees:[26]




[26] https://www.sdmmeta.com/teamIntroduction

Notably, the Prospectus discloses a total of eleven employees meaning these six would be the majority of Company employees.[27] However, D&O Defendants do not appear here, nor do any other Directors or Officers listed in the prospectus:[28]

| **Directors and Executive Officers(1):** |
|---|
| SAM WAI HONG(2) |
| Yunting Chen |
| Qiongshan Huang |
| Jinbo Xu |
| Ung Ching Hee |
| Huihuang Lin |

54. Further, the cartoon employee "YunFengCong" is claimed to be a famous Chinese muralist who was received by Chinese President Xi Jinping as well as King Charles and Queen Camilla of the United Kingdom.[29] While an artist named Cong Yunfeng with these credentials does exist, he is a man, not a woman, and he is based primarily in London as well as Beijing,[30] not Macau, Singapore or any of the Company's operating locations in China.[31]

[27] https://www.sec.gov/Archives/edgar/data/2014955/000121390025039463/ea020341216-424b4_smart.htm#T14.

[28] https://www.sec.gov/Archives/edgar/data/2014955/000121390025039463/ea020341216-424b4_smart.htm#T15

[29] https://www.sdmmeta.com/teamIntroduction

[30] https://www.tiktok.com/@congyunfeng; https://www.instagram.com/yunfeng_cong/; https://www.globaltimes.cn/page/202309/1298981.shtml.

[31] https://www.sec.gov/Archives/edgar/data/2014955/000121390025039463/ea020341216-424b4_smart.htm#T15.

**Employees**

The operating entities strive to attract, recruit, and retain talents through its compensation and benefit programs, as well as learning and career development opportunities. The operating entities enter into employment agreements with each of its employees. We believe that the operating entities maintain good working relationships with their employees, and they did not experience any labor disputes in the reported fiscal years. None of the employees are represented by labor unions.

The operating entities have a total of 11 full-time employees as of the date of this prospectus. The operating entities had 14, 21, and 21 full-time employees as of September 30, 2024, 2023 and 2022, respectively. The operating entities did not employ any temporary or part-time employees in the last three fiscal years. The following table sets forth the numbers of employees categorized by function as of the date of this prospectus:

| Function | Number |
|---|---|
| Administration | 2 |
| Sales | 1 |
| Project | 5 |
| Logistics | 3 |
| **Total** | 11 |

71

Table of Contents

The following table sets forth the numbers of employees categorized by location as of the date of this prospectus.

| Location | Number |
|---|---|
| Macau, China | 5* |
| Zhuhai City, Guangdong Province, China | 1* |
| Xiamen City, Fujian Province, China | 6 |
| Guangzhou City, Guangdong Province, China | 0 |
| **Total** | 11 |

55. Additionally, a thorough search by Lead Plaintiffs' counsel has not revealed any information suggesting that Cong Yunfeng actually has any affiliation with SDM, suggesting the Company misappropriated his identity for use on its website.

56. Together, the misstatement of more than 50% of company employees in the Prospectus, as well as the theft of a famous artist's identity to inflate perceived value of the Company is materially false and misleading. Again, all Defendants knew of and/or recklessly disregarded the existence of these falsities, enabling the scam by endorsing the IPO, and failing to gatekeep the offering of SDM shares.

57. Each of the D&O Defendants signed the Registration Statement. The Prospectus contains the signature of the Auditor Defendant with respect to its opinion and report on the Company's financial statements. The Prospectus identifies Tiger Securities as the "sole-book

running manager" for the IPO and Tiger Securities was a party and the sole signatory to the Underwriting Agreement, which was submitted as Exhibit 1.1 to the Form F-1/A Registration Statement filed by the Company on April 25, 2025. The Underwriting Agreement expressly provides in pertinent part in Section 4(b) under the heading Covenants of the Company that:

> During the period beginning on the date hereof and ending on the later of the Closing Date or such date as, in the reasonable opinion of Underwriters' Counsel, the Prospectus is no longer required by law to be delivered (or in lieu thereof the notice referred to in Rule 173(a) under the Securities Act is no longer required to be provided) in connection with sale by an underwriter or dealer (the "**Prospectus Delivery Period**"), prior to amending or supplementing the Registration Statement, the Disclosure Materials or the Prospectus, the Company shall furnish to the Underwriters and Underwriters' Counsel for review a copy of each such proposed amendment or supplement, and the Company shall not file any such proposed amendment or supplement to which the Underwriters reasonably object.

Accordingly, the Underwriter Defendants had the opportunity to review the Registration Statement and Prospectus publicly filed with the SEC.

**B. The Market Manipulation Scheme Starts to Unfold**

58. As far back as November 2022, FINRA was warning of a "heightened threat of fraud" in "small-capitalization IPOs," with "primary operations in China" like SDM.[32] As gatekeepers to U.S. markets, the Underwriter Defendants were duty-bound to keep abreast of these updates as part of their due diligence and by "pay[ing] close attention to suspicious trends in the marketplace and how they may affect members' obligations" as well as "continuously evaluat[ing] and adapt[ing] their supervisory systems as well as compliance and risk management programs to ensure that they are monitoring for and addressing this threat."[33] Failure to do so "subjects

---

[32] https://www.finra.org/rules-guidance/notices/22-25

[33] *Id.*

underwriters to potential liability under Sections 11 and 12 of the Securities Act of 1933, providing a strong incentive for underwriters to help ensure the accuracy of disclosures in registration statements."[34]

59. FINRA's November 2022 notice goes on to detail "the following elements" as clear "red flags" to alert underwriters of a foreign micro-cap IPO "ramp-and-dump" scam:[35]

> • ***Small Market Capitalization and Limited Public Float*** *– Each IPO typically raised less than $25 million and valued each issuer at less than $100 million, with the IPO typically issuing fewer than 20 million shares.*
>
> • ***Foreign Issuers*** *– Many issuers or their operating subsidiaries or affiliates maintained primary operations in China, but some issuers also based their operations in other countries.*
>
> • ***Foreign Broker-Dealers*** *– Foreign broker-dealers, primarily based in Hong Kong, have allocated or been allocated significant amounts of the shares, sometimes as much as 90 percent or more of the shares. The practice of allocating a majority of the shares issued in an IPO to foreign broker-dealers may limit the supply of the public float available to the market on the day of the IPO and during the price increase phase of ramp-and-dump schemes.*
>
> • ***Concentrated Allocations of IPO Shares*** *– Underwriters and selling group members (including foreign broker-dealers) may be allocating the majority of shares to a small number of investors, leading to a concentration of shares being held in very few hands.*
>
> • ***Nominee Accounts*** *– Nominee accounts, primarily accounts opened for foreign nationals, have been opened at U.S. broker-dealers to invest in IPOs and later place manipulative orders and trades to inflate aftermarket prices. These accounts raise potential concerns, including:*
>
> - *account holders' possible lack of awareness that their identities were being used to open the accounts;*
> - *apparent contradictions between customers' trading activity and their ages, occupations, investment experience, financial status and sources of funding;*

---

[34] *Id.* (citing SEC Release on Proposed Rules for Special Purpose Acquisition Companies, Shell Companies, and Projections, Release Nos., 33-11048, 34-94546, IC-34549, File No. S7-13-22 (March 30, 2022)).

[35] *Id.*

- *indicators that funding for initial IPO customer accounts are being financed, directly or indirectly, by the issuer or other third parties, including through potential loans; and*
- *possible centralized control over a group of nominee accounts, which can be identified through indicators such as:*
    - *similar timing of account opening;*
    - *similar referral source or point of contact for accounts;*
    - *similar customer contact information;*
    - *similar bank account information;*
    - *similar IP addresses;*
    - *similar initial account funding amounts;*
    - *similar amounts of indications of interest for IPOs; and*
    - *multiple customers or accounts placing layered buy limit orders at or around the same time, at prices higher than the IPO price, and frequently in odd-lot amounts or other "red flags" of pre-arranged or coordinated trading.*

- ***Foreign Omnibus Accounts*** *– Omnibus accounts at U.S. broker-dealers maintained for foreign financial institutions, including foreign broker-dealers, have been observed liquidating large amounts of shares of the small-cap issuers at the peak of price spikes associated with suspected ramp-and-dump schemes. In some cases, the accounts in question did not trade the securities at all until significant price increases occurred and appeared to time their sales for when the stock price peaked.*

- ***Significant Price Spikes and Drops*** *– Most shares of issuers that are the subject of suspected ramp-and-dump schemes experienced significant price increases in the opening trade on an exchange and in continuous trading on the day of, or days immediately following, the listing. These price increases did not appear to be driven by news or material events. After the spike, the price quickly declined to a level at or below the offering price.*

- ***Allegations of Social Media Scams*** *– Investors in securities that are the subject of suspected ramp-and-dump schemes (including investors in the IPOs) have complained about investing in a ramp-and-dump scheme through so-called "pig butchering." These schemes sometimes begin with a seemingly misdirected text message or message on a social media messaging application leading to a relationship (sometimes romantic in nature) between victims and bad actors. After a relationship is established, the bad actor will make a recommendation to the victim to place limit orders in certain securities at a specific time and price.*

Importantly, FINRA notes this list is not exclusive or exhaustive. Specifically, that "the schemes are evolving, and members should pay close attention to suspicious trends in the marketplace and how they may affect members' obligations. FINRA encourages members to continuously evaluate

and adapt their supervisory systems as well as compliance and risk management programs to ensure that they are monitoring for and addressing this threat."[36]

60. For response procedures, FINRA goes on to detail exactly what underwriters of securities should implement to maintain compliance in the face of these social media based "ramp-and-dump" or pump-and-dump schemes:[37]

> *In the context of ramp-and-dump schemes, moreover, members should consider their obligations under the Bank Secrecy Act (BSA), its implementing regulations and FINRA Rule 3310 (Anti-Money Laundering Compliance Program), including to:*
>
> - *maintain customer identification programs to verify the identity of each customer;*[38]
> - *verify the identity of the beneficial owners of legal entity customers;*[39]
> - *establish due diligence programs for correspondent accounts for foreign financial institutions, including omnibus accounts held for foreign financial institutions;*[40]
> - *establish and implement policies and procedures that can be reasonably expected to detect and cause the reporting of suspicious transactions conducted or attempted by, at, or through U.S. broker-dealers to the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN);*[41] *and*
> - *implement appropriate risk-based procedures for conducting ongoing customer due diligence, including to understand the nature and purpose of customer*

---

[36] *Id.*

[37] *Id.*

[38] *See* FINRA Rule 3310(b) and 31 C.F.R. § 1023.220.

[39] *See* FINRA Rule 3310(f)(ii) and 31 C.F.R. §1010.230.

[40] *See* FINRA Rule 3310(b) and 31 C.F.R. § 1010.610; *c.f.* SEC Staff Bulletin: Risks Associated with Omnibus Accounts Transacting in Low-Priced Securities, https://www.sec.gov/tm/risks-omnibus-accounts-transacting-low-priced-securities.

[41] *See* FINRA Rule 3310(a) and 31 C.F.R. § 1023.320.

> *relationships for the purpose of developing a customer risk profile, and to conduct ongoing monitoring to identify and report suspicious transactions.*[42]

> Upon detection of red flags related to ramp-and-dump schemes through monitoring, members should consider whether additional investigation, customer due diligence measures or a Suspicious Activity Report (SAR) filing may be warranted. Members also should consider whether, depending on the facts and circumstances, other obligations may be implicated, including, but not limited to the following
>
> - *Exchange Act Rule 10b-5; Securities Act, Section 17(a); and FINRA Rule 2020 (Use of Manipulative, Deceptive or Other Fraudulent Devices);*
> - *FINRA Rule 2010 (Standards of Commercial Honor and Principles of Trade);*
> - *FINRA Rule 2090 (Know Your Customer);*
> - *FINRA Rule 3110 (Supervision);*
> - *FINRA Rule 4512 (Customer Account Information);*
> - *FINRA Rule 5130 (Restrictions on the Purchase and Sale of Initial Equity Public Offerings);*
> - *FINRA Rule 5131 (New Issue Allocations and Distributions);*
> - *SEC Regulation M;*
> - *SEC Market Access Rule, Securities Exchange Act Rule 15c3-5; and*
> - *SEC Identity Theft Red Flags Rule, Regulation S-ID.*

61. The Company's low-float IPO carried all these "red flags" of a carefully designed vehicle for market manipulation. The scarce public float allowed for price manipulation because even modest buying pressure could create explosive price movement. Had the Underwriter

[42] *See* FINRA Rule 3310(f) and 31 C.F.R. § 1023.210(a)(5).

Defendants conducted even basic due diligence, much less complied with the aforementioned due-diligence FINRA requires, they would have uncovered this fraud at the outset and prevented the IPO from ever happening. Likewise, had the Auditor Defendant conducted even basic due diligence, much less complied with PCAOB standards it claimed, it would also have detected this obvious fraud preventing registration and sale of SDM securities.

62. On June 16, 2025, SDM filed on Form S-8, a registration statement, to register up to 5,000,000 ordinary shares, which could be used under the Company's 2025 Equity Incentive Plan. The June 16, 2025, Form S-8 was signed by the D&O Defendants. These 5,000,000 ordinary shares were not subject to any lock-up agreement and were free to trade upon distribution. The Form S-8 stated only that the 5,000,000 had been registered; it did not state that the shares had been distributed to recipients, nor did it state when the shares would be distributed. The Company continued to represent as recently as its Form 6-K dated September 22, 2025 that SDM's 2025 Equity Incentive Plan "reserves" the 5,000,000 shares for distribution, continuing to suggest that the shares were still reserved and had not yet been distributed to recipients. However, the Company's Form 20-F Annual Report filed with the SEC on February 12, 2026, (the "Form 20-F") issued after the lawsuit was filed and while the NASDAQ halt remained in effect, stated that the 5,000,000 ordinary shares had been distributed to four unidentified employees on June 13, 2025, three days before the original disclosure of the Equity Incentive Plan. If true, the statement in the Form 20-F means that 5,000,000 SDM shares were available to be traded in the market for nearly eight months before they were publicly acknowledged by the Company, including during the critical period when the stock price was being manipulated, as described below.

63. In connection with the June 16, 2025, Form S-8, the Company attached as Exhibit 23.1 the Consent of Enrome LLP, which was signed by Enrome, consenting to the incorporation

by reference of its Report of Independent Registered Public Accounting Firm from the Prospectus and thereby affirming once again its accuracy as of June 16, 2025. This statement was false and misleading because the statement failed to disclose that: (1) SDM was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) SDM's public statements and risk disclosures omitted any mention of intention to use fraudulent trading or the realized risk of market manipulation used to drive the Company's stock price; (3) that, as a result, SDM securities were at unique risk of a sustained halt in trading by either of the SEC or NASDAQ; (4) the Auditor Defendant and Tiger Securities had been involved with numerous foreign microcap public offerings that were utilized in market manipulation schemes; (5) Tiger Securities had been fined and censured by FINRA just weeks before the IPO on April 25, 2025 for failing to have a reasonable system in place to identify potentially suspicious deposits of thinly traded low-priced securities; (6) the Company lacked proper internal controls over financial reporting and accounting personnel to maintain compliance with GAAP and SEC requirements; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

64. Within days of the filing of the June 16, 2025, Form S-8, and with no other news or announcements to support it, the Company's stock price began to climb on a significant surge in daily trading volume. On June 20, 2025, the Company's stock price closed at $8.70 per share, ***increasing 25.7%*** over a closing price of $6.92 at the prior day's close. Moreover, this stark, unexplained rise in share price was accompanied by a ***56-fold increase in trading volume***, up to 464,900. On the subsequent trading day, SDM's stock price continued to climb, closing at $10.31 per share, on trading volume of 510,100.

65. The upward trajectory of the Company's stock price and trading volume continued, reaching a Class Period intraday high of $29.40 per share on July 28, 2025, on trading volume of 918,000. On July 30, 2025, the Company posted its Class Period high closing price of $26.00 per share on volume of 701,000.

66. Following a month-long upward trajectory and again, based on no news, announcement or filing from or involving SDM, the Company's stock price cratered over the subsequent week on daily trading volumes close to or exceeding 1,000,000, down to $10.17 per share on August 8, 2025.

67. Although public filings and news were scarce, a coordinated effort was made on social media and messaging applications, such as WhatsApp, to "pump" SDM led by stock promoters posing as financial advisors. Based on information and belief, these stock promoters, among the John Doe Defendants, used aliases and false photographs to conceal their true identities and were key cogs in the stock manipulation scheme surrounding SDM.

68. These stock promoters targeted investors on social media via advertisements and posts, which solicited them to join stock trading and tips "groups" on messaging applications. One such group was labeled "75 Market Hot Spot Tracking Group" and marketed as the "Liz Ann Sonders investment group." After an initial solicitation, when an investor contacted the group about joining, a stock promoter posing as a financial advisor within the WhatsApp group would tout prior returns to convince the investor to follow their advice and join the group. For instance, in one message, a stock promoter touted that the trading group achieved a "Total Profit Percentage" of "156.39%" by trading in Applied Optoelectronics, Inc. (NASDAQ: AAOI) within the assigned "Purchase Date" and "Sell Date." In another instance, the impersonator touted a "Total Profit Percentage [of] 134%-136%" on trades of Nebius Group N.V. (NASDAQ: NBIS) within the

assigned "Purchase Date" and "Sell Date." Along with touting these results, the stock promoters advertised new investment opportunities, such as SDM, emphasizing the expectation that investment would return profits of "180%-260%."

69. Once the investor joined the group, a stock promoter, posing as a financial advisor, would provide false and misleading information regarding the Company's stock and its potential, and encourage the investor to "maximize" their funds to achieve the largest profit. When investors confirmed that they purchased stock as instructed by the stock promoters, the stock promoter instructed the investor to provide screenshots of their transactions illustrating their ownership of SDM. For example, messages from stock promoters included and were similar to the following:


21:23
4G
Stock Strategy Research...
Announcements
market trends.
01:48
~Edmund Nichols
+1 (314) 309-9255
Community admin
This is one of the reasons why our company chose SDM as the target for this transaction. Another important factor is that as a publicly listed company, SDM not only maintains strong growth in its existing core business areas but is also seeking greater breakthroughs. The company is currently negotiating to establish a deep cooperative relationship with a well-known American peer. If the agreement is ultimately reached, SDM's future potential value will achieve a significant breakthrough. Therefore, the dual advantages of deep cooperation between cryptocurrency assets and well-known companies provide a solid guarantee for the security of this transaction.
01:56
~Edmund Nichols
+1 (314) 309-9255
Community admin
Based on the above comprehensive factors, our investment team's
You can reply to announcements, but only community admins can send them.


Hannah Hickey
widziano wczoraj o 17:30
Sir, I've heard our institution is calculating the funds for today's purchases and is preparing to add more chips around $14.50 to maximize the gains from this Eagle 6. I believe this decision will instill confidence in more investors. I've also increased my position. 🙌🏻🙌🏻
So you can also increase your buying power based on the limit price of 14.40 and enter a position at a lower price to achieve higher profits.
14:03
Before the market opened, SDM released positive news, detailing the smooth progress of its cryptocurrency business. These positive developments are expected to push SDM's stock price to a higher level, and SDM's stock price will continue to rise from the current level. 🥳
🥳
14:37

70. These stock promoters also provided investors with PowerPoint presentations specifically concerning SDM, which were materially false and misleading. For example, one such presentation included the following slides regarding SDM:




M&A Opportunity with HubSpot
1. Market and Customer Expansion
SDM leverages HubSpot's global channels and brand awareness to gain faster access to European, American and international markets, and HubSpot leverages SDM's local customer resources in Southeast Asia and China to increase regional penetration.
2. Complementary products and services
SDM specializes in content creation, campaign execution and localization. HubSpot provides marketing automation and data analytics. The combination of the two organizations creates an end-to-end integrated solution for a more complete customer experience.
3. Data and Technology Synergy
HubSpot's customer data and analytics enable SDM to deliver more accurate content and placements. SDM's offline campaigns and user feedback feed HubSpot's algorithms and product iterations.
4. Financial and Brand Value
Acquisition by HubSpots delivers higher customer unit prices, renewal rates and profitability. At the same time, the co-branding of the two companies enhances market presence, customer trust and investor attention.
The merger of SDM and HubSpot will enable global market expansion through complementary strengths, create a complete end-to-end solution, improve operational efficiency based on data and technology, and create win-win synergies in terms of financial returns and brand influence.


M&A Opportunity with HubSpot
After being acquired by HUBS, SDM will leverage HUBS's AI and SaaS technologies to upgrade its products and form an intelligent integrated platform, and accelerate its international expansion through HUBS's channels and customer resources. It is expected that in 3-5 years, SDM's revenue scale is expected to maintain an average annual growth rate of 60%-85%, and gradually grow from a regional digital media service provider to a globalized platform enterprise.
The acquisition of SDM will enable HUBS to successfully enter the digital media and content services sector, enrich its ecosystem, and drive new profit models through the combination of data and media scenarios. In the next 3-5 years, the overall revenue growth of HUBS is expected to increase to around 15% after the consolidation of SDM, while the profit margins will steadily improve due to the scale effect and cross-border synergies, which will enhance its competitiveness in the global market.




71. These slides included representations touting the Company's increased "flexibility and capital turnover efficiency, enabling it to respond more quickly to market change[,]" "combination of services [as] sticky and difficult to replace in the local market[,]" and the "competitive advantage" of "local market experience in Singapore, China and Macau." Further, the slides discuss a "M&A Opportunity with HubSpot" that "will enable global market expansion through complementary strengths, create a complete end-to-end solution, improve operational efficiency based on data and technology, and create win-win synergies in terms of financial returns and brand influence." The presentation also explains that SDM's "majority shareholder has begun to gradually increase its stake[,]" and that "market capitalization is expected to grow to $1.2-$1.5 billion and [SDM's] share price is expected to reach the $45-$55 range after the acquisition is completed."

72. The stock promoters reinforced the PowerPoint presentation slides in discussing SDM with investors. For instance, a stock promoter in discussing the purported "M&A Opportunity" told an investor that "our investment research team ***held another online meeting with SDM's senior management*** [and] [t]he company continues to deepen its collaboration with HUBS, a renowned industry peer." (emphasis added). Further, the promoter explained that "HUBS not only fully shares its technology with SDM but also incorporates HUBS's business model and strategy into the partnership."

**C. Regulators Take Aim at Companies Similar to SDM**

73. While the market manipulation scheme was in progress and attempts to "pump" SDM securities were underway, regulators were aligning and doubling their efforts to curtail such manipulation on U.S. stock exchanges.

74. On September 3, 2025, the NASDAQ issued a press release entitled "NASDAQ PROPOSED CHANGES TO ITS LISTING STANDARDS[,]" in which NASDAQ announced proposals aimed at regulating micro-cap, low public float companies, like SDM, that had increasingly become vehicles of fraud. The press release stated the following in pertinent part:

> Today, Nasdaq proposed a new set of enhancements to its initial and continued listing standards, reinforcing its long-standing commitment to capital formation while ensuring investor protection and upholding market integrity. These proposed updates introduce enhanced requirements for minimum company public float and capital raised during initial public offerings, alongside stricter suspension and delisting procedures for companies failing to meet Nasdaq's continued listings standards.
>
> The revised standards include:
>
> - A $15 million minimum market value of public float, applicable to new listings on Nasdaq under the net income standard.

- An accelerated process for suspending and delisting companies with a listings deficiency that also have a Market Value of Listed Securities below $5 million.

- A $25 million minimum public offering proceeds requirement for new listings of companies principally operating in China.

"***Investor protection and market integrity are central to Nasdaq's mission***," said John Zecca, Executive Vice President and Global Chief Legal, Risk & Regulatory Officer. "These enhancements reflect our ongoing commitment to evolve our standards in step with market realities and to lead by example in promoting fair and orderly markets. By increasing our standards for the minimum public float and the public offering raise in certain new listings, it provides a healthier liquidity profile for public investors, while still making emerging companies available to investors through our exchange. These new listing standards represent one step in a necessary, industry-wide effort—alongside regulators, U.S. exchanges, and market participants—to closely examine trading behaviors in small company securities, with the goal of safeguarding market integrity and enhancing protections for investors."

***The actions announced today follow Nasdaq's proactive review of trading activity, particularly emerging patterns associated with potential pump-and-dump schemes in U.S. cross-market trading environments.*** The proposed updates are also reflective of how market dynamics and company valuations have evolved over time, prompting the need to recalibrate Nasdaq's minimum liquidity standards to suit today's environment. These enhancements ensure that the thresholds for public listings remain relevant and effective as markets evolve.

As part of these changes, Nasdaq is reintroducing a minimum public offering proceeds requirement specifically for companies principally operating in China, building on previous standards set for "restrictive markets," in which the Public Company Accounting Oversight Board (PCAOB) could not inspect auditors.[1] By applying this threshold, Nasdaq strengthens investor protections and enhances the liquidity profile of companies to reflect today's market environment.

In addition to the enhanced listing standards, ***Nasdaq will continue to actively refer cases to the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) on potentially manipulative trading activities, while strengthening our cooperation with both domestic and international regulators***

> ***to reinforce effective oversight and maintain high standards across U.S. markets.***

(emphasis added.)

75. Accordingly, NASDAQ was seeking to implement more rigid standards on companies with the profile of SDM and cooperating with both the SEC and FINRA to identify manipulative trading activities.

76. On September 5, 2025, the SEC issued a press release announcing "the formation of a task force that will strengthen and enhance the Division of Enforcement's efforts to identify and combat cross-border fraud harming U.S. investors." In the release, the SEC explained, in pertinent part, that "[t]he Cross-Border Task Force will focus initially on investigating potential U.S. federal securities laws violations related to foreign-based companies, including potential market manipulation, such as 'pump-and-dump' and 'ramp-and-dump' schemes."

77. On September 12, 2025, the U.S. Department of Justice ("DOJ") issued a press release entitled "Co-CEO of Chinese Publicly Traded Technology Company and Financial Advisor Indicted for Over $100M Securities Fraud Scheme," which stated the following, in pertinent part:

> According to the indictment, Lai Kui Sen is the co-CEO of OST, and Yan Zhao, who goes by the aliases Hank Shi and Hank Shu, among others, is a financial advisor. ***OST is a Cayman Islands company with its principal operations in China***, that claimed to be a manufacturer of display modules used in consumer electronics, commercial LCD displays, and automotive displays. OST is publicly traded on NASDAQ and operated, at one point, with a variable interest entity (VIE) investment structure, which is often used by Chinese companies.
>
> According to the indictment, Sen, Zhao, and others allegedly engaged in a ***complex scheme to first provide a group of fifteen co-conspirators with tens of millions of OST shares through two non-bona fide securities transactions.*** In one of these transactions, these co-conspirators paid nothing to OST for more than 70 million OST shares.

> The indictment alleges that, ***on April 15, 2025, the same day that the select investors received their first tranche of heavily discounted OST shares, a fraudulent campaign began to artificially inflate the price and trading volume of the OST stock. This included promoting the stock by impersonating real investment advisors, among others, promoting the stock on social media, and creating a false impression of market-wide buying momentum.*** To capitalize on OST's artificial price inflation and to harm the victim investors, Zhao and Sen facilitated the opening of brokerage accounts for certain select investors and orchestrated the selling of the shares that they had received either heavily discounted or for no remuneration. ***These sales generated substantial profits of approximately more than $110 million. Ultimately, according to the indictment, unwitting investors suffered significant losses when, on June 26, 2025, OST lost over $950 million in market capitalization, representing over 94% of its value.***
>
> (emphasis added.)

78. On September 17, 2025, the SEC filed its Verified Opposition to Petitioner's Motion to Quash Subpoena under the Right to Financial Privacy Act of 1978 in the matter of *Peiyong v. U.S. Securities and Exchange Commission*, Case No. 1:25-mc-00350 (Dkt. No. 7).[43] Therein, the SEC stated the following, in pertinent part:

> SEC Staff is investigating whether ***dozens of IPOs registered with the SEC and trading on U.S. exchanges between 2020 and 2025 (the "Relevant Offerings") were used as vehicles in a suspected IPO manipulation scheme ("Suspected IPO Manipulation Scheme") orchestrated by the persons and entities with ties to Hong Kong and China (the "Syndicate").*** In the days, weeks, and/or months following its IPO, each issuer's securities ***experienced unusual, extreme, and unexplained price movements, generally consisting of a large upward price spike followed by a drop to a price far below the high and often below the offering***

[43] On January 13, 2023, the SEC issued a Formal Order Directing Private Investigation and Designating Officers to Take Testimony in *In the Matter of Market Manipulation in Certain IPOs* (HO-14588) (the "Formal Order"). The Formal Order states that the SEC has information that tends to show that "U.S. Broker Dealers[,]" "Issuers[,]" "Hong Kong Broker-Dealers[,]" and "other persons and entities" may have been or may be engaging in violations of the federal securities laws including Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

> ***price.*** Today, these issuers' securities typically trade at a fraction of the offering price.
>
> SEC Staff's investigation indicates that ***the unusual price movements following the Relevant Offerings may have resulted from illegal market manipulation that the Syndicate orchestrated.*** Specifically, SEC Staff has information that tends to show that:
>
> - individuals and entities affiliated with the Syndicate acquired most of the issuers' public float by purchasing shares in many Relevant Offerings;
> - shortly after the Relevant Offerings, anonymous third parties on the Internet convinced investors to purchase the issuers' securities at prices substantially higher than they were offered; and
> - the accounts under the Syndicate's control that participated in the Relevant Offerings sold the issuers' shares at a significant profit into the bubble the solicitations created.
>
> (emphasis added.)

79. Later, on October 7, 2025, United States District Court Judge Dale E. Ho denied the Motion to Quash and granted enforcement of the subpoena. In his Memorandum Order, the Honorable Judge Ho explained that the SEC clearly linked the petitioner to its investigations, noting that the petitioner "appears to have also received significant proceeds from the Suspected IPO Manipulation scheme from other suspected [scheme] members," including "an entity in which [he] purchased a 40% ownership interest," and that one alleged entity connected with the scheme "disbursed a significant portion of . . . funds to other accounts related to Petitioner," including "one of [his] personal bank accounts."[44]

---

[44] At this time, Plaintiffs lack sufficient information linking Han Peiyong or his affiliates directly to SDM and accordingly, cannot name Mr. Peiyong in connection with this Complaint. However, discovery could yield more information regarding Mr. Peiyong's (or others') involvement in the alleged violations of law specific to SDM and in turn, Mr. Peiyong and/or his affiliates (or other similar persons and affiliates) could be named as a Defendant or Defendants in an amended pleading.

80. Accordingly, regulators had identified companies with a similar profile to SDM—recently IPOed, micro-cap companies with ties to China and miniscule public floats—as, at minimum, problematic for investors, and even worse, vehicles specifically designed to deceive investors, commit securities fraud, and market manipulation. Further, the SEC and DOJ were actively investigating and pursuing enforcement proceedings against potential co-conspirators and perpetrators of securities fraud via an IPO stock manipulation scheme similar to that alleged herein.

81. On June 8, 2026, the SEC responded to Lead Counsel's FOIA request, stating that it was withholding records that may be responsive under 5 U.S.C. § 552(b)(7)(A). This exemption protects from disclosure records compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement activities.

**D. Defendants Make Additional Material Misrepresentations and Omissions**

82. On September 22, 2025, the Company filed on Form 6-K with the SEC reporting the Company's financial results for the six months ended March 31, 2025. Therein, the Company reported total revenue of approximately $14.5M for the six months ended March 31, 2025, relative to $8.2M for the six months ended March 31, 2024, and net income of $0.4M for the six months ended March 31, 2025, compared to $0.2M for the six months ended March 31, 2024. Defendant Chen signed the Form 6-K.

83. Further, the Company stated the following:

> ***The Company has evaluated subsequent events through September 22, 2025,*** the date the financial statements were issued and filed with the U.S. Securities and Exchange Commission. ***Based on the Company's evaluation, no other event has occurred requiring adjustment or disclosure in the notes to the consolidated financial statements,*** except the following:
>
> On May 5, 2025, the Company closed its initial public offering of 1,500,000 ordinary shares at a public offering price of $4.00 per share for a total of $6,000,000 in gross proceeds. The Company raised total net proceeds of $4,980,000 after deducting underwriting

> discounts and commissions and offering expenses. In addition, the Company granted to its underwriters an option for a period of 45 days after the closing of the initial public offering to purchase up to an additional 225,000 ordinary shares at the public offering price, less underwriting discounts.
>
> The ordinary shares were previously approved for listing on The Nasdaq Capital Market and commenced trading under the ticker symbol "SDM" on May 2, 2025.
>
> On May 7, 2025, the Company closed the sale of an additional 225,000 ordinary shares, par value $0.001 per share, pursuant to the full exercise of the over-allotment option granted to the underwriters in connection with the Company's initial public offering, at the public offering price of $4.00 per share. As a result, the Company raised additional gross proceeds of $900,000, before deducting underwriting discounts and offering expenses.
>
> On June 16, 2025, the Board of Directors of the Company approved the 2025 Equity Incentive Plan. ***The Plan reserves 5,000,000 ordinary shares for issuance pursuant to awards such as stock options, restricted shares, restricted share units, and other equity-based awards.*** The Plan is intended to support the Company's long-term growth by attracting and retaining key personnel.
>
> (emphasis added.)

On this news, the Company's stock price climbed from a closing price of $13.81 per share on September 19, 2025, to a closing price of $14.85 per share on September 22, 2025.

84. Accordingly, the statements identified above in paragraph 83 were false and misleading because the Company and the D&O Defendants failed to disclose: (1) a materialized risk of market manipulation based upon the excessive volume and price volatility in the Company's shares unrelated to any Company developments; (2) the resultant increased likelihood that NASDAQ and/or the SEC would halt trading in the Company's securities; and (3) the Company suffered from a material weakness in its internal controls over financial reporting and lacked proper accounting personnel to ensure compliance with GAAP and SEC requirements. Additionally, the Company and the D&O Defendants either affirmed that 5,000,000 ordinary

shares pursuant to the 2025 Equity Incentive Plan were "reserve[d]" and thus, were not distributed and had not entered the market on or prior to September 22, 2025, or materially misled the market with respect to the number of shares publicly available if the statement in the Company's Form 20-F is accurate and those 5,000,000 ordinary shares had been distributed to four unidentified employees as of June 13, 2025, and thus, were available to be utilized in furtherance of a market manipulation scheme.

85. Next, on September 23, 2025, pre-market, SDM issued a press release entitled "Smart Digital Group Announces Plan to Establish A Diversified Cryptocurrency Asset Pool"[45] that stated the following:

> On September 19, Smart Digital Group Limited (Nasdaq: SDM) (the "Company") announced its plan to establish a diversified cryptocurrency asset pool, with a strategic focus on investing in cryptocurrencies such as Bitcoin and Ethereum. The initiative emphasizes assets that demonstrate stability, transparency, and alignment with the Company's long-term strategic goals.
>
> This move is designed to strengthen the Company's position in the digital asset ecosystem while leveraging the growing acceptance of cryptocurrencies in global markets. By allocating resources to established and transparent digital assets, the Company aims to enhance portfolio diversification and capture value in the evolving digital economy.
>
> Smart Digital Group Limited will implement a structured approach to manage and safeguard its cryptocurrency holdings, incorporating robust risk management and compliance protocols. Further details regarding the size and allocation of the asset pool will be communicated in accordance with regulatory requirements and market conditions.

---

[45] Notably, this statement is also false and misleading because SDM did not make any announcement on September 19, 2025, regarding the Company's intention to establish a diversified cryptocurrency asset pool, or otherwise.

On this news, the Company's shares climbed again over the next two trading days from a closing price of $14.85 per share on September 22, 2025, to close at $15.61 per share on September 23, 2025, and then, $16.01 per share on September 24, 2025.

86. On September 26, 2025, before the market opened, SDM issued a press release announcing its intention to establish a "diversified cryptocurrency asset pool, with a strategic focus on investing in cryptocurrencies such as Bitcoin and Ethereum." The press release specifically stated the following:

> Smart Digital Group Limited (Nasdaq: SDM) today announced ***its plan to establish a diversified cryptocurrency asset pool, with a strategic focus on investing in cryptocurrencies such as Bitcoin and Ethereum. The initiative emphasizes assets that demonstrate stability, transparency, and alignment with the company's long-term strategic goals.***
>
> This move is designed to strengthen Smart Digital Group position in the digital asset ecosystem while leveraging the growing acceptance of cryptocurrencies in global markets. By allocating resources to established digital assets, the company aims to enhance portfolio diversification and capture value in the evolving digital economy.
>
> Smart Digital Group Limited will implement a structured approach to manage and safeguard its cryptocurrency holdings, incorporating robust risk management and compliance protocols. Further details regarding the size and allocation of the asset pool will be communicated in accordance with regulatory requirements and market conditions.
>
> (emphasis added.)

87. The statements identified above in paragraphs 85-86 were and are false and misleading because they failed to disclose that: (1) SDM was the subject of a market manipulation and fraudulent promotion scheme involving social-media and messaging application based misinformation and impersonators posing as financial professionals; (2) SDM's stock had already experienced a severe run-up based on unexplained fluctuations in trading volume that was typical

of a market manipulation and fraudulent promotion scheme; (3) that, as a result, SDM securities were at unique risk of a sustained halt in trading by either of the SEC or NASDAQ; (4) the Company suffered from a material weakness in its internal controls over financial reporting and lacked proper accounting personnel to ensure compliance with GAAP and SEC requirements; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

**E. The Truth Is Revealed**

88. Within minutes of the market opening and the publication of the press release on September 26, 2025, regarding the Company's cryptocurrency plan, the Company's stock price began to climb and volume in the Company's stock spiked with over 270,000 orders at 9:33 AM alone. This volume of activity amounted to approximately 30% of the Company's average daily trading volume in a single minute. In response, NASDAQ temporarily halted trading in the Company's stock at 9:34 AM due to volatility. NASDAQ permitted trading to resume at 10:49 AM.

89. After the resumption of trading, SDM's stock price resumed trading initially at just $2.27 per share before eventually closing at $1.85 per share on record daily trading volume of 25.9 million shares. On the crash, SDM's stock price lost 88% of its value from its prior day closing price of $13.61.

90. The truth was further revealed after the market's close on September 26, 2025, when the SEC announced "the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934, of trading in the securities of Smart Digital Group Limited[.]" The SEC explained that the temporary suspension was due to "potential manipulation in the securities of SDM effectuated through recommendations made to investors by unknown persons via social media to purchase the securities of SDM, which appear to be designed to artificially inflate the

price and volume of the securities of SDM." The suspension of trading in SDM was ordered for the period from 4:00 AM EST on September 29, 2025, through 11:59 PM EST on October 10, 2025.

91. On October 8, 2025, SDM filed on Form 6-K with the SEC a Report of Foreign Private Issuer finally acknowledging the suspension. The Company's filing stated:

> **Suspension of Trading**
>
> On September 26, 2025, Smart Digital Group Limited (the "Company") received from the U.S. Securities and Exchange Commission (the "SEC") an order suspending trading in the Company's securities for the period from 4:00 AM ET on September 29, 2025, through 11:59 PM ET on October 10, 2025, which order is available at https://www.sec.gov/files/litigation/suspensions/2025/34-104112.pdf. On September 30, 2025, the Company received an information request from The Nasdaq Stock Market LLC ("Nasdaq") for certain information and documents. The Company has not participated in any price manipulation activity and will fully cooperate with both the SEC and Nasdaq.

92. The truth continued to emerge on October 11, 2025, when NASDAQ announced that trading in SDM would remain suspended pending receipt of "additional information requested from the company." Despite the Company's denial of involvement in market manipulation and statement that it intends to "fully cooperate with both the SEC and Nasdaq[,]" trading in the Company's stock remains halted by the NASDAQ pending the information request, which was first issued on September 30, 2025.

93. On October 24, 2025, SDM filed on Form 6-K with the SEC a Report of Foreign Private Issuer, which stated, in pertinent part:

> ***Resignation of Previous Chief Financial Officer***
>
> Smart Digital Group Limited (the "Company") received the resignation letter of its Chief Financial Officer ("CFO"), Ms.

> Qiongshan Huang, effective October 20, 2025. Mr. [*sic*] Huang's resignation was not related to the Company's financial or operating results or to any disagreements or concerns regarding the Company's financial or reporting practices.

94. On January 30, 2026, SDM filed with the SEC a Late Filing Notice (NT 20-F), which stated the Company's Form 20-F "could not be filed within the prescribed time period" because the "imposed time constraints that have rendered the timely filing of the Form 20-F impracticable without undue hardship and expense[.]"

95. On February 12, 2026, SDM filed with the SEC its Form 20-F Annual Report. Therein, the Company revealed that management concluded that as of September 30, 2025, "our disclosure controls and procedures were ineffective … due to the presence of material weakness in internal control over financial reporting." Further, "[t]he material weakness that has been identified relates to the lack of accounting staff and resources with appropriate knowledge of the U.S. GAAP and SEC reporting and compliance requirements to design and implement formal period-end financial reporting policies and procedures to address complex U.S. GAAP technical accounting issue in accordance with U.S. GAAP and the SEC requirements."

96. The Form 20-F also disclosed that "[O]n June 16, 2025, the Company granted unrestricted 5,000,000 ordinary shares and vested immediately to four employees" and that "[a]s of September 30, 2025, the 2025 Equity Incentive Plan was fully issued as vested."

97. Finally, SDM stock remains halted from trading through the date of this filing.

### F. The Contemporaneous Suspension of Trading in QMMM Amid Similarities to SDM

98. SDM was not the only NASDAQ-traded stock suspended from trading by the SEC before trading opened on September 29, 2025. Contemporaneously with SDM, the SEC also suspended trading in QMMM Holdings Limited ("QMMM") between September 29, 2025, at 4:00 AM EST and October 10, 2025, at 11:59 PM EST. In the announcement, the SEC explained in

substantially identical language that trading in the securities of QMMM was suspended due to "potential manipulation in the securities of QMMM effectuated through recommendations, made to investors by unknown persons via social media to purchase the securities of QMMM, which appear to be designed to artificially inflate the price and volume of the securities of QMMM."

99. This similarity was neither isolated, nor coincidental. QMMM completed its IPO of 2.15M shares, raising $8.6M at an offering price of $4.00 per share on July 18, 2024. QMMM is purportedly an award-winning digital advertising and marketing production services company, which is incorporated in the Cayman Islands with principal executive offices located in Hong Kong. Accordingly, similar to SDM, QMMM was a recent, micro-cap IPO with an opaque business model, incorporated in the Cayman Islands, and with connections to China.

100. Further, QMMM was also the subject of a significant illicit stock promotional effort on social media and across messaging applications. As with SDM, investors were solicited by individuals posing as financial advisors and provided with false and misleading information regarding QMMM, aimed at driving up the stock price and creating a universe of buyers willing to purchase QMMM stock at artificially inflated prices.

101. On September 9, 2025, QMMM issued a press release announcing its intention "to establish a ***diversified cryptocurrency treasury initially targeting Bitcoin, Ethereum, and Solana (SOL).***" QMMM stated, in pertinent part, that "[t]he treasury, which is expected to reach an initial scale of US$100 million, will serve as a ***foundation for both stability and transparency***." On this news, the price of QMMM stock surged from a closing price of $11.57 per share on September 8, 2025, to close at $207.00 and trade as high as $303.00 intraday on September 9, 2025.

102. However, on September 10, 2025, QMMM's stock crashed back down to a closing price of $109.50, a loss of 47.1% off the prior day's closing price. The sell-off of QMMM stock continued through September 15, 2025, when it closed at $71.75 per share and stabilized thereafter.

103. The SDM press releases issued on September 23 and September 26, 2025, were substantively identical to QMMM's September 9, 2025, press release, and intended to trigger a run-up of the Company's stock price. However, SDM stock was halted by the NASDAQ on the morning of September 26, 2025, as the volume spike began, stopping the momentum and revealing the fraud. Before trading opened on the next trading day, both SDM and QMMM were suspended from trading by the SEC.

104. On October 11, 2025, NASDAQ announced that trading would be halted in QMMM until QMMM fully satisfied NASDAQ's request for additional information. NASDAQ took the exact same stance and used substantially identical language with respect to SDM.

105. On November 24, 2025, QMMM filed on Form 6-K with the SEC a Report of Foreign Private Issuer, which announced that Mr. Cheung Yee Man Irving resigned as an independent director of QMMM's Board of Directors and was replaced by Lui Kwok Wai.

106. At the time of this filing, neither SDM nor QMMM has resumed trading, and each experienced leadership departures during the suspension of trading and while NASDAQ conducts its investigation.

### G. The Underwriter Defendants Are Sanctioned by Chinese Regulators

107. The Underwriter Defendants' demonstrated history of inadequate compliance and gatekeeping is not limited to the FINRA fine and censure imposed weeks before the SDM IPO. The same Up Fintech corporate group that owns and controls Tiger Securities has been the subject of a sustained and escalating enforcement campaign by Chinese securities regulators, with parallel findings issued by Hong Kong securities regulators, all arising from the same categories of

compliance failure that enable the use of U.S.-listed micro-cap issuers like SDM as vehicles for market manipulation.

108. In December 2022, the China Securities Regulatory Commission (the "CSRC") publicly identified the Up Fintech group, operating in mainland China and Hong Kong under the "Tiger Brokers" brand, as engaged in unlicensed cross-border securities activity directed at mainland Chinese investors. The CSRC ordered the Up Fintech group to halt the recruitment of new clients from mainland China and to bring its operations into compliance with PRC law. Defendant Up Fintech represented publicly at the time that it had implemented the rectification measures mandated by the CSRC. As Chinese regulators would later determine, those representations were not accurate.

109. On June 4 and June 5, 2025, weeks after the SDM IPO had closed and while Tiger Securities was executing the over-allotment option, the China Securities Journal, the official national securities-industry publication affiliated with the Xinhua News Agency, published a two-part investigative series documenting that the Up Fintech group had continued the precise conduct the CSRC had ordered it to cease in 2022. The articles documented, among other findings, the following:

a. Tiger Brokers customer service representatives were actively assisting prospective clients in fabricating false overseas residency documentation in order to evade the regulatory restrictions on the recruitment of mainland Chinese clients;

b. Tiger Brokers maintained technical workarounds, including TestFlight beta-distribution channels and Android sideload installations, that were designed to allow mainland Chinese users to access the Tiger trading

application after that application had been removed from authorized Chinese application stores; and

c. A reporter for the China Securities Journal personally and successfully opened accounts with Tiger Brokers as a mainland Chinese new client on two separate occasions, in direct contradiction of public statements by Up Fintech's chief executive officer Wu Tianhua denying the conduct described in the first article.

110. On May 22, 2026, the CSRC issued prior notices of administrative penalties against multiple Up Fintech operating subsidiaries and against Wu Tianhua personally. The CSRC's Beijing Bureau imposed an administrative fine of approximately RMB 308.1 million on Tiger Brokers (NZ) Limited, an operating subsidiary of Up Fintech and an affiliate of Tiger Securities, together with confiscation of approximately RMB 103.1 million in illegal gains, for a total penalty of approximately RMB 411.2 million (equivalent to approximately US$57 million). Wu Tianhua received a personal warning and a personal administrative fine of RMB 1.25 million.

111. The CSRC found that the Up Fintech operating entities had conducted securities marketing and order-handling activities in the People's Republic of China without CSRC approval and without securities brokerage or margin-financing licenses, in violation of Article 120 of the PRC Securities Law and constituting the illegal operation of securities business, with additional violations of Article 97 of the PRC Securities Investment Fund Law and Article 63 of the PRC Futures and Derivatives Law. In the official announcement, the CSRC stated that, since 2025, illegal cross-border securities-business activity by certain overseas brokers had "obviously rebounded." Defendant Up Fintech has publicly accepted the penalty and has stated that it intends to implement the rectification ordered by the CSRC. The CSRC also noted that mainland Chinese

retail client assets constituted approximately ten percent of Up Fintech's total retail client assets as of year-end 2025.

112. Simultaneously with the CSRC's May 22, 2026 announcement, the Hong Kong Securities and Futures Commission identified additional compliance failures in Up Fintech's Hong Kong-licensed subsidiaries, including (a) inadequate due diligence on account-opening documents, (b) the acceptance of suspicious or forged documents in the account-opening process, and (c) weaknesses in managing cross-border agency relationships with overseas intermediaries. The Hong Kong SFC's findings were issued in addition to and consistent with the CSRC's findings, and reflect that the compliance failures at the Up Fintech group were neither isolated to a single jurisdiction nor confined to a single subsidiary.

113. The CSRC's May 22, 2026 enforcement action against the Up Fintech group was issued in conjunction with a joint Implementation Plan approved by the State Council of the People's Republic of China and promulgated by eight separate Chinese governmental agencies, including the CSRC, the People's Bank of China, the National Financial Regulatory Administration, the Ministry of Public Security, and the State Administration of Foreign Exchange. The Implementation Plan, which mandates a two-year campaign to eliminate unlicensed cross-border financial services to mainland Chinese investors, reflects the systemic and well-documented nature of the compliance failures by the Up Fintech group.

114. The structural compliance failures identified by Chinese and Hong Kong regulators at the Up Fintech group, including inadequate know-your-customer procedures, the acceptance of forged or fabricated identity and residency documentation, the maintenance of channels designed to circumvent regulatory controls, and the systemic failure to detect the use of foreign or nominee accounts for prohibited activity, are precisely the categories of compliance failure that FINRA has

repeatedly identified as the operative mechanism of ramp-and-dump schemes targeting U.S.-listed foreign micro-cap securities.

115. As FINRA explained in Regulatory Notice 22-25 and reiterated in its 2025 and 2026 Annual Regulatory Oversight Reports, ramp-and-dump schemes depend on the opening of nominee accounts at U.S. broker-dealers for foreign nationals, in circumstances where the broker-dealer's know-your-customer and surveillance controls are inadequate to identify either (i) coordination between accounts that are nominally distinct but beneficially controlled by the same persons or networks, or (ii) trading patterns that constitute manipulation rather than ordinary investment activity.

116. The FINRA settlement of April 25, 2025 found, in substantively the same terms, that Tiger Securities and its affiliated broker-dealer TradeUP Securities, Inc. operated foreign financial institution omnibus accounts that transacted in thinly traded low-priced securities under an anti-money laundering program that was not reasonably designed to detect potentially suspicious activity, and that the firms' supervisory and surveillance procedures did not identify patterns of potentially suspicious activity across accounts or across multiple days. The CSRC enforcement action against the Up Fintech parent and the Hong Kong SFC's parallel findings confirm that the compliance failures sanctioned in April 2025 by FINRA were not isolated to a single U.S. subsidiary but were and are characteristic of the entire Up Fintech group's regulatory posture.

117. The pattern of conduct documented in the May 22, 2026 CSRC enforcement action establishes that the Up Fintech parent entities had been formally on notice of significant compliance failures across their global operations since at least December 2022. Notwithstanding that notice, the Underwriter Defendants agreed to act as sole book-running manager for the SDM

offering in May 2025, just weeks after the FINRA settlement documented the U.S.-side counterpart of the same compliance failures, and during the same period in which the China Securities Journal was preparing the investigative series that would document the active continuation of the conduct the CSRC had ordered the Up Fintech group to cease three years earlier.

118. That the same Up Fintech management group, having received and disregarded successive regulatory warnings, undertook the SDM underwriting and exercised the full over-allotment option in May 2025, supports a strong inference that the Underwriter Defendants knew, or recklessly disregarded the fact, that their compliance posture was inadequate to perform the gatekeeping functions required of an underwriter of a small-capitalization foreign-issuer initial public offering of the SDM type.

119. The personal administrative warning and personal RMB 1.25 million fine imposed by the CSRC on Wu Tianhua, the chief executive officer of Defendant Up Fintech, is a contemporaneous finding by a sovereign securities regulator that the compliance failures sanctioned were not the conduct of isolated employees but were known to, or recklessly disregarded by, senior management of the Up Fintech corporate group. The CSRC's finding is consistent with, and corroborates, the inference that the Underwriter Defendants' senior management knew, or recklessly disregarded the fact, that the compliance posture of the Up Fintech group was inadequate to support the representations made in the SDM Offering Documents.

## V. AUDITOR DEFENDANT ALLEGATIONS

120. The Auditor Defendant certified in the Prospectus, as part of the Registration Statement, and in the June 16, 2025, Form S-8 that "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the company as of

September 30, 2024 and 2023 and the results of its operations and cash for each of years ended September 30, 2024 and 2023, in conformity with the account principles generally accepted in the United States of America ('U.S. GAAP')." Additionally, the Auditor Defendant stated the following:

> Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statement. We believe that our audits provide a reasonable basis for our opinion.

121. In issuing its audit opinion on SDM's financial statements, the Auditor Defendant failed to comply with U.S. Generally Accepted Accounting Principles ("GAAP") or the standards of the Public Company Accounting Oversight Board ("PCAOB") requirements. These standards required the Auditor Defendant to exercise due professional care in the performance of the audit and to obtain competent, sufficient evidentiary matter to form a basis for its opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud. The Auditor Defendant failed to: (i) test the existence and business purpose of SDM's largest customers; (ii) confirm the collectability of reported receivables; (iii) evaluate the substance of the Company's purported event-planning and digital-asset activities; (iv) investigate related-party transactions and prepayments; and (v) assess whether SDM had sufficient accounting personnel and controls to prepare U.S. GAAP financial statements for a U.S.-listed public company.

122. The Auditor Defendant failed to identify or disclose SDM's pre-IPO financial-statement, revenue-recognition, customer-existence, and internal-control problems. The Auditor

Defendant's opinions were materially false and misleading because the financial statements they certified were materially misleading in the respects alleged herein, including the Company's unsupported revenue from dormant or non-verifiable customers, unsupported revenue tied to purported NFT and digital-asset activity, unsupported event-planning revenue, and inadequate disclosure of internal-control weaknesses affecting U.S. GAAP and SEC reporting.

123. In conducting its audits, the Auditor Defendant had access to the files and key employees of the Company at all relevant times. The Auditor Defendant had continuous access to and knowledge of the Company's confidential internal, corporate, financial, operating and business information, and had the opportunity to observe and review SDM's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements. Accordingly, the Auditor Defendant was aware of the significant deficiencies at the Company. Thus, if the Auditor Defendant had complied with PCAOB standards, it would have determined that there was no reasonable basis for its audit report because, among other things, the Auditor Defendant was aware of undisclosed facts tending to seriously undermine the accuracy of its audit report and conformity with GAAP and the Company's reported financial metrics.

124. The Auditor Defendant's representations were material to investors because SDM was a newly public, foreign issuer with no meaningful public operating history in the United States. Without the Auditor Defendant's clean audit opinion and consent to the inclusion of its audit report in the Registration Statement and Prospectus, SDM could not have completed the IPO in the form presented to investors.

125. The Auditor Defendant's knowledge is evidenced by SDM's own public website. SDM published an August 22, 2023 article describing a meeting between SDM personnel and

Enrome in Singapore titled, in substance, 'A Visit to Enrome Audit Firm in Singapore' concerning IPO audit issues and industry prospects.

126. According to SDM's own translated article, the purpose of the visit was to communicate, discuss, and resolve issues related to finance, internal control, and compliance for SDM in connection with its planned global-market expansion and IPO. The article further stated that the visit demonstrated SDM's emphasis on audit transparency, cooperation, and financial accuracy, and that the Company was seeking to prevent and resolve potential audit issues.

127. Thus, the Auditor Defendant was not a passive outside auditor with only limited after-the-fact knowledge of SDM's financial statements. The Auditor Defendant was directly involved in discussions with SDM about IPO audit issues, finance, internal control, compliance, financial accuracy, and potential audit issues before the IPO. The Auditor Defendant therefore knew, or was reckless in not knowing, the very categories of problems later concealed from investors.

128. The Auditor Defendant's audit failures were not isolated. Enrome served as auditor for multiple recent foreign issuers that shared SDM's profile and later experienced extreme price volatility, trading halts, and severe investor losses, including DarkIris, Pitanium, and Star Fashion. DarkIris was halted by Nasdaq on September 30, 2025, and its stock allegedly fell from $10.43 at the open to $1.29 at the close. Pitanium, which completed its IPO in May 2025, allegedly experienced an extreme run-up and decline in July 2025 and was later suspended by the SEC from October 6 through October 17, 2025, after which Nasdaq halted trading pending a request for additional information. Star Fashion allegedly completed its IPO in October 2024, rose sharply in late December 2024 and early January 2025, and then declined more than 80% on January 22, 2025. The Auditor Defendant therefore had particular reason to scrutinize SDM as a low-float

foreign issuer whose business description, website, customer base, revenue support, and internal controls all displayed obvious red flags. Instead, the Auditor Defendant issued a clean audit opinion that helped create the appearance of legitimacy necessary for the IPO and subsequent market manipulation scheme.

## VI. CLASS ACTION ALLEGATIONS

129. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired SDM securities between May 5, 2025, and September 26, 2025, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which the Defendants have or had a controlling interest.

130. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SDM's shares actively traded on the NASDAQ. While the exact number of Class Members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of SDM shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by SDM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

131. Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

132. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

133. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of SDM; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

134. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII. UNDISCLOSED ADVERSE FACTS

135. The market for SDM securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and misleading statements and/or failures to disclose, SDM securities traded at artificially inflated prices during the Class Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired SDM securities relying upon the integrity of the market price of the Company's securities and market information relating to SDM and have been damaged thereby.

136. Throughout the Class Period, Defendants materially misled the investing public thereby inflating the price of SDM securities, by publicly issuing false and/or misleading statements and/or omitting to disclose the material facts necessary to make Defendants' statements, as set forth herein, not false or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about SDM's business, operations and prospects as alleged herein.

137. At all relevant times, the material misrepresentations and omissions particularized in the Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SDM's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company, its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements and omissions during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## VIII. LOSS CAUSATION

138. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class.

139. During the Class Period, Lead Plaintiffs and the Class purchased SDM's securities at artificially inflated prices and were damaged thereby. The price of SDM's securities significantly declined when the misrepresentations made to the market, and/or the information

alleged to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

140. During the Class Period, the prices at which Lead Plaintiffs and the Class purchased SDM securities were artificially inflated as a direct and proximate result of the fraudulent scheme alleged herein, including the coordinated use of offshore and nominee accounts to generate artificial trading volume in SDM securities, the dissemination through social-media platforms and messaging applications of solicitations by persons impersonating financial professionals that were designed to attract retail purchasers of SDM securities at inflated prices, and the gatekeeping failures of the Underwriter, Auditor, and Agent Defendants that permitted the scheme to be executed through a U.S.-listed issuer. When the scheme could no longer be sustained and the manipulative trading patterns it generated attracted regulatory scrutiny, the artificial inflation in SDM securities was removed from the market. The price decline and trading halts described above were the foreseeable consequence of, and were caused by, the materialization of the manipulative acts and practices comprising the scheme alleged herein, and Lead Plaintiffs and the Class were damaged thereby.

## IX. SCIENTER ALLEGATIONS

141. As alleged herein, SDM, D&O Defendants, the Auditor Defendant and the Underwriter Defendants acted with scienter because Defendants: (1) knew and/or recklessly disregarded that the public documents and statements issued or disseminated in the name of SDM were materially false and/or misleading; (2) knew and/or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; (3) knowingly or with reckless disregard substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws; and/or (4) knowingly and/or with reckless disregard engaged in a common scheme to manipulate and

artificially inflate the Company's stock price to the detriment of the Company's investors. As set forth elsewhere herein in detail, the D&O Defendants, by virtue of their receipt of information reflecting the true facts regarding SDM, their control over, and/or receipt and/or modification of SDM's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

142. The extent of the alleged fraud is enormous in magnitude, going to the very legitimacy of SDM's business and involving a complex, sophisticated market manipulation scheme, which Defendants, even if not active participants in every stage of the fraud, could not overlook except in the absence of intent or recklessness, in particular because it brings the legitimacy of SDM's operations and existence into question.

143. Absent reckless disregard, the Company and the D&O Defendants, as well as the Auditor Defendants and the Underwriter Defendants, in connection with their due diligence with the IPO and assisting in bringing SDM to a publicly traded platform, all knew or should have known that the Company's internal controls over financial reporting and accounting were substantially impaired, suffered from a material weakness and were unreliable. These internal control issues were so fundamental and clear that they bolster the inference of scienter. In the Form 20-F, the Company admitted that the internal controls were impaired due to a lack of qualified personnel and training in compliance with GAAP and SEC reporting requirements.

144. The Company's, D&O Defendants' and Auditor Defendants' material misstatements and omissions all relate to the Company's core business, much of which is alleged to be false, misleading and fraudulent. It would be absurd to suggest that these Defendants would

be unaware of the legitimacy of the Company's business, its internal controls and accounting practices. The Defendants had access to information contradicting their public statements.

145. The Company's shares were halted from trading by the SEC due to suspected market manipulation and subsequently, halted from trading by the NASDAQ pending a request for information. If the Company and D&O Defendants were able to clarify the multitude of issues surrounding the fraud alleged herein, the Company's stock would have resumed trading months ago. Instead, the D&O Defendants have all resigned from the Company and SDM's stock remains halted by the NASDAQ.

146. The Company issuing near-identical statements to those published by QMMM prior to QMMM's extreme run-up signals an intent by the Company and the D&O Defendants to trigger a run-up in the Company's stock and indicates that the Company and the D&O Defendants were aware of, but did not adequately disclose the existence of such a market manipulation scheme to the Company's investors. Further, the Company and the D&O Defendants displayed a deliberate intent to manipulate the market and did so with an aim to of artificially inflating the stock price to increase the value of the shares held by Defendant Hong and various affiliates of SDM and the D&O Defendants, which would have occurred absent the trading halts by the SEC and NASDAQ that signaled the fraud and led to the price collapse.

147. Each of the Underwriter and Auditor Defendants were compensated, directly or indirectly, in connection with the IPO and thus, were motivated to rubber-stamp their contribution to the Company's IPO, which was conducted without adequate or even basic due diligence to ensure the accuracy of their respective contributions and the Company's disclosures, operations, controls or legitimacy.

148. The Underwriter and Auditor Defendants, directly or indirectly, were aware of and were participants in IPOs of similar, foreign microcap companies, whose investors suffered extreme losses following the IPO due to unusual trading volatility and extreme price shifts consistent with market manipulation. Accordingly, the Underwriter and Auditor Defendants were aware of the risk of market manipulation. Further, the Company and the D&O Defendants, as lead executives, likewise knew or should have known that the Underwriter and Auditor Defendants were previously involved in similar foreign, microcap IPOs, which suffered extreme losses due to market manipulation schemes.

149. The Company and the D&O Defendants likewise knew or should have known when the 5,000,000 ordinary shares were distributed pursuant to the Company's 2025 Employee Incentive Plan, and if issued prior to September 22, 2025, whether these ordinary shares were used in furtherance of a market manipulation scheme.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

150. The market for SDM's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, SDM's securities traded at artificially inflated prices during the Class Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of SDM's securities and market information relating to the Company, and have been damaged thereby.

151. During the Class Period, the artificial inflation of SDM's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading

statements about SDM's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of SDM and its business, operations, and prospects, thus causing the price of SDM's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements and/or omissions during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, and each of them has been damaged as a result.

152. At all relevant times, the market for SDM securities was an efficient market for the following reasons, among others:

a. SDM shares met the requirements for listing and were listed and actively traded on NASDAQ, a highly efficient and automated market; and/or

b. SDM communicated with public investors through established market communication mechanisms, including through dissemination of press releases on national circuits of major newswire services and through other public disclosures.

153. As a result of the foregoing, the market for SDM securities promptly digested current information regarding SDM from all publicly available sources and reflected such information in SDM's share price. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of SDM's securities at artificially inflated prices and a presumption of reliance applies.

154. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements

and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. NO SAFE HARBOR

155. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in purportedly forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SDM who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against SDM, the D&O Defendants, & the Auditor Defendant

156. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

157. During the Class Period, Defendants SDM, the D&O Defendants, and the Auditor Defendant carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase SDM securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants and each defendant, took the actions set forth herein.

158. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SDM securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

159. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SDM's financial well-being and prospects, as specified herein.

160. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of SDM's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in

light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

161. Each of the D&O Defendants' primary liability and controlling person liability arises from the following facts: (i) the D&O Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company or their business relationship in connection with the Company and its IPO, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, internal controls and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data information about the Company's finances, operations, and sales at all relevant times, and/or were required to perform reasonable due diligence in connection with the IPO; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

162. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SDM's true financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by

Defendants' misstatements and/or omissions regarding the Company's business, operations, financial well-being and prospects, and exposure to material, realized risks throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

163. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, set forth above, the market price of SDM securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and other members of the Class acquired SDM securities during the Class Period at artificially inflated prices and were damaged thereby.

164. At the time of said misrepresentations and/or omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that SDM was experiencing, which was not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their SDM securities, or, if they had acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

165. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

166. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) & (c) for Fraud in Connection with the Sale or Purchase of a Security Against SDM, D&O Defendants, the Auditor Defendant, the Underwriter Defendants, and the John Doe Defendants

167. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

168. During the Class Period, Defendants SDM, the D&O Defendants, the Auditor Defendant, the Underwriter Defendants, and John Doe Defendants directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly: (i) employed devices, schemes or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

169. The Defendants identified in connection with this Claim employed devices, schemes and artifices to defraud and deceive Class Period purchasers of SDM securities by: (i) initiating, endorsing, executing and/or completing the IPO on SDM's behalf and permitting trading in SDM securities on a national securities exchange while knowing or acting in reckless disregard to the fact that SDM was not a legitimate business; (ii) initiating, endorsing, executing and/or completing the IPO on SDM's behalf and permitting trading in SDM securities on a national securities exchange while knowing or acting in reckless disregard to the fact that SDM was the target of a market manipulation and promotional scheme; and/or (iii) attempting to manufacture artificial inflation by triggering volatility trading via false and misleading statements.

170. At the time, Lead Plaintiffs and other members of the Class were ignorant of the identified Defendants' deceptions. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the deceptive acts and schemes, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their SDM securities, or, if they had acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

171. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder.

172. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## THIRD CLAIM

### Violation of Section 20(a) of the Exchange Act Against the D&O Defendants, Tiger Holdings, Up Fintech Global, and Up Fintech

173. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

174. The D&O Defendants, Tiger Holdings, Up Fintech Global, and Up Fintech acted as controlling persons within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the identified Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the entities that they control, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. The D&O Defendants

were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

175. In particular, the D&O Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same. Likewise, Defendants Tiger Holdings, Up Fintech Global, and Up Fintech as parent entities had direct and supervisory involvement in the day-to-day operations of Tiger Securities and therefore, had the power to control or influence the particular transactions giving rise to the securities violations alleged herein and exercise the same.

176. As set forth above, SDM, the D&O Defendants, the Underwriter Defendants, and the Auditor Defendant each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the D&O Defendants, Tiger Holdings, Up Fintech Global, and Up Fintech are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## FOURTH CLAIM

### Violation of § 11 of the Securities Act Against SDM, the D&O Defendants, the Auditor Defendant, the Underwriter Defendants, and the Agent Defendants

177. Lead Plaintiffs repeat and reallege each and every allegation contained above, as if fully set forth herein.

178. This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants identified above, and does not sound in fraud and does not allege fraudulent intent or scienter in connection therewith, which are not elements of a claim under § 11 of the Securities Act.

179. The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements therein not misleading, and omitted to state material facts required to be stated therein.

180. The identified Defendants are strictly liable to the Lead Plaintiffs and the Class for the misstatements and omissions.

181. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, without omission of any material facts, and were not misleading.

182. By reason of the conduct alleged herein, each Defendant violated, or controlled a person who violated, § 11 of the Securities Act.

183. Lead Plaintiffs acquired SDM ordinary shares pursuant to the Registration Statement.

184. Lead Plaintiffs and the Class have sustained damages. The value of SDM ordinary shares declined substantially subsequent to the IPO and indeed, have been halted from trading indefinitely as a result of Defendants' violations.

185. At the time of their purchases of SDM ordinary shares, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could

have discovered the facts upon which this Complaint is based, to the time that this action commenced. Less than three years have elapsed between the time the securities upon which this Cause of Action is brought were offered to the public and the time that this action was commenced.

## FIFTH CLAIM

### Violation of § 12(a)(2) of the Securities Act Against SDM, the D&O Defendants, the Auditor Defendant, the Underwriter Defendants, and the Agent Defendants

186. Lead Plaintiffs repeat and re-allege each and every allegation contained above, as if set forth herein.

187. This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) on behalf of the Class, against all Defendants.

188. By means of the defective prospectus, the identified Defendants promoted, solicited and sold SDM ordinary shares to Lead Plaintiffs and other members of the Class.

189. The Prospectus for the IPO contained untrue statements of material fact, and concealed and omitted material facts, as detailed above. Defendants owed Lead Plaintiffs and the other Class members, who purchased SDM ordinary shares pursuant to the prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated, in order to make the statements therein not misleading. Defendants, in exercising reasonable care, should have known of the misstatements and omissions contained in the prospectus, as set forth above.

190. Lead Plaintiffs did not know, nor in the exercise of reasonable diligence could Lead Plaintiffs have known of the untruths and omissions contained in the prospectus at the time Lead Plaintiffs acquired SDM ordinary shares.

191. By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Lead Plaintiffs and the other Class members who purchased SDM ordinary shares pursuant to the prospectus, sustained substantial damages in connection with their purchases of the shares. Accordingly, Lead Plaintiffs and other Class Members who hold SDM ordinary shares pursuant to the prospectus, have the right to rescind and recover the consideration paid for their shares, and hereby tender their ordinary shares to Defendants sued herein. Class members who have sold their ordinary shares seek damages to the extent permitted by law.

## SIXTH CLAIM

### Violation of § 15 of the Securities Act Against SDM, the D&O Defendants, Tiger Holdings, Up Fintech Global, Up Fintech, and the Agent Defendants

192. Lead Plaintiffs repeat and re-allege each and every allegation contained above, as if set forth fully herein.

193. This Cause of Action is brought pursuant to § 15 of the Securities Act against SDM, the D&O Defendants, Tiger Holdings, Up Fintech Global, Up Fintech, and the Agent Defendants.

194. The D&O Defendants were controlling persons of SDM, within the meaning of the Securities Act. By virtue of their positions as directors or senior officers of SDM or Cogency, as alleged above, these Defendants each had the power to influence, and exercised the same, over the Company to cause it to engage in the conduct complained of herein. The Company controlled the D&O Defendants and all SDM employees. Cogency controlled De Vries, who signed the Registration Statement at the direction of Cogency, and all Cogency employees involved in the SDM IPO, and De Vries acted on behalf of and controlled Cogency with respect to its involvement in connection with the particular transactions giving rise to the securities violations alleged herein. Likewise, Defendants Tiger Holdings, Up Fintech Global, and Up Fintech as parent entities had

direct and supervisory involvement in the day-to-day operations of Tiger Securities and therefore, had the power to control or influence Tiger Securities with respect to the particular transactions giving rise to the securities violations alleged herein and exercise the same.

195. The D&O Defendants each had a series of direct and indirect business and personal relationships with other directors, officers and major shareholders of SDM. SDM, the D&O Defendants, the Underwriter Defendants, and the Agent Defendants were culpable participants in the violations of §§ 11 and 12(a)(2) of the Securities Act alleged in the Fourth and Fifth Causes of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 9, 2026

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**

/s/ Patrick Donovan
Benjamin Y. Kaufman
Matthew M. Guiney
Patrick Donovan
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
kaufman@whafh.com
guiney@whafh.com
donovan@whafh.com

**MORRIS KANDINOV LLP**

/s/ Andrew W. Robertson
Aaron T. Morris
Leonid Kandinov
Andrew W. Robertson
305 Broadway, 7th Floor
New York, New York 10007
Tel: (212) 431-7473
aaron@moka.law
leo@moka.law
andrew@moka.law

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ John T. Jasnoch
John T. Jasnoch (pro hac vice)
Mollie Chadwick (pro hac vice)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
Fax: (619) 233-0508
jjasnoch@scott-scott.com
mchadwick@scott-scott.com

*Co-Lead Counsel for Plaintiffs*